**Carol D. PATKUS, Plaintiff-Appellant,**

v.

**SANGAMON–CASS CONSORTIUM, Sangamon County, Cass County, and Richard Austin, individually and in his official capacity, Defendants-Appellees.**

No. 84–1063.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1985.

Decided Aug. 7, 1985.

Charles J. Speta, Springfield, Ill., for plaintiff-appellant.

Ann L. Carr, Sangamon County State's Atty. Office, Springfield, Ill., for defendants-appellees.

Before ESCHBACH and FLAUM, Circuit Judges, and DOYLE, Senior District Judge.* .

FLAUM, Circuit Judge.

This action involves several challenges to the conduct of defendants in connection with the employment and subsequent discharge of plaintiff Carol D. Patkus. Patkus was employed as the administrator of the Sangamon-Cass Consortium, an agency responsible for management of the Comprehensive Employment and Training Act (CETA) program for two counties, from March 1978 until December 1980. Patkus's complaint alleged violations of her rights to free speech, free association, and due process under 42 U.S.C. § 1983; sex discrimination in pay and discharge under 42 U.S.C. § 2000e; and sex discrimination in pay under 29 U.S.C. § 206. After a four-day bench trial, the district court entered judgment for the defendants on all counts. Patkus appeals from this judgment in all respects. We reverse the district court's judgment on the issue of a due process violation and affirm on the remaining issues.

I.

In July 1977, Sangamon County and Cass County established, by agreement, the Sangamon-Cass Consortium (Consortium) to receive funds for and to administer a CETA program. Sangamon County, as the primary employer, had final authority and responsibility for employment decisions. An Advisory Council was established, pursuant to federal requirements, to perform limited supervisory and advisory functions for the Consortium's staff. On March 22, 1978, Carol Patkus was hired as administrator of the Consortium, replacing another woman. The duties of the Consortium administrator were to manage and supervise its regular business, to maintain contact with federal and state CETA offices, to develop policies for the operation of a CETA program, and to take an active role in improving and coordinating manpower resources in the two-county area.

In January 1980, a Consortium employee, Evelyn Townshend, filed a complaint against Patkus with the United States Department of Labor (DOL). DOL rejected the complaint, stating that personnel matters were to be resolved locally, and recommended that the Consortium appoint an impartial hearing officer to investigate the matter. Richard Austin, in his capacity as chairman of the Sangamon County Board, appointed a private attorney, Bruce Stratton, to be the hearing officer. Austin di-

* The Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, is sitting by designation.

rected Stratton to conduct the investigation in compliance with federal regulations governing internal investigations, located at 20 C.F.R. § 676.83 (1984). On June 24, 1980, Patkus wrote to one of the attorneys handling Townshend's complaint to request that Stratton be required to follow the regulatory procedures. The following day Stratton, Townshend's counsel, and counsel representing Sangamon County met and agreed to certain procedures for the investigation. One of these procedures, giving Stratton the power to interview persons on his own initiative or at the request of Townshend or Patkus, did not agree with the federal regulation governing such power.

Five months later, on November 25, 1980, Patkus and several other Consortium staff members sent a telegram to the DOL. The telegram stated that the Consortium staff had concerns regarding the "political involvement regarding this investigator"

and listed a number of specific charges against Stratton.[1] On the same day, Patkus wrote to Austin requesting that the investigation be conducted in conformance with federal guidelines. The following day, November 26th, Patkus called a meeting of some, but not all, members of the Consortium's Advisory Council. She informed them that the problems of the Consortium were a "political battle," charged that the County Board was undermining her authority, and referred to the Stratton investigation as a "witch hunt." She also informed the Council members present that those members who had not been invited were not objective or unbiased.

Shortly thereafter, on December 5, 1980, Austin informed Patkus that she was being discharged from her position as Consortium Administrator. In a written statement, signed by Austin and the head of the CETA committee, she was given the following reasons for her dismissal:

**1.** The text of the telegram reads, in part, as follows:

Staff have openly stated concerns regarding the political involvement surrounding this investigator for the following reasons:
1. The investigator is the secretary of the Sangamon County Republican Central Committee.
2. He is also an active member and sometimes chairman of several subcommittees established by the Sangamon County Board.
3. Most of the negotiations between this individual and the state's attorney and with the complainant's attorney have taken place without our awareness or knowledge, and we have no documentation on file to substantiate payment of over $3,724.50 for his alleged services paid out of CETA funds thru October 31, 1980.
4. Many of us are extremely concerned about Mr. Stratton's unprofessional manner and conduct in dealing with members who might be seen as being favorable toward the administration. On numerous occasions he has made baseless accusations that the consortium has refused to cooperate with him, has obstructed his investigation, and that some who have cooperated with him have been subjected to reprimand.
5. Mr. Stratton has not confined his investigation to the charges in the complaint.
 A. He is demanding information concerning daily operations of the office which have no bearing on the complaint.
 B. He is not using a structured set of questions for persons interviewed.

C. He openly displays a hostile attitude toward any staff he interviews who displays support toward the administrator.
D. He has asked several staff members, "How would you resolve this complaint?"
E. It appears that the thrust of his investigation is to discredit the administrator and other key staff members.
F. Mr. Stratton has allegedly prepared a preliminary report which was submitted to complainant's attorney and the state's attorney. Access to this report has been denied to this consortium.
G. Staff who have been interviewed by Mr. Stratton have reported that they have been contacted by county board members not associated with the CETA committee of the county board and were advised that if they would agree to a second interview and change their answers, that their jobs would be protected. This indicates that the confidentiality of this investigation has not been protected.

In a subsequent determination of several complaints against the Sangamon-Cass CETA program, a DOL Grant Officer stated that the regulations do not prohibit an elected official (presumably Austin) from reviewing the CETA program under his or her jurisdiction. He also indicated that questions about whether the Stratton inquiry was proper in light of the Consortium's grievance procedure and whether its cost was reasonable were to be the subject of a separate DOL investigation.

A. You have engaged in insubordinate conduct toward the Sangamon County Board and the Chairman of the Sangamon County Board in that:

1. You told employees of the Consortium and at least one public official that the Chairman of the Sangamon County Board was a person not to be trusted and that these employees were not to communicate with him.

2. You attempted to cause the United States Department of Labor to intervene into the inquiry of a personnel matter authorized by the prime sponsor and attempted to stop or suspend said inquiry.

B. You have engaged in abusive and insubordinate conduct toward the Consortium Advisory Council in that you called a meeting of certain members of the Council while excluding other members, and advised those in attendance that the other members of the Council not at the meeting could not be objective or unbiased.

C. You have engaged in abusive behavior towards Consortium employees when such conduct was not related to effective administration of the Consortium, thereby causing employee morale to deteriorate in that:

1. You caused or acquiesced in the discipline of an employee as a result of said employee giving a statement to the individual conducting the inquiry authorized by the prime sponsor.

2. You caused Consortium employees to fear the loss of their job, suspension, or other discipline for failure to demonstrate personal loyalty to you.

3. Some employees were assigned work in such volume that CETA clients could not be properly serviced or receive proper counseling.

D. You caused the prime sponsor, specifically the Sangamon County Board, to be held in public disrepute by:

1. Referring to the Chairman of the Sangamon County Board, your superior, as a person not to be trusted.

2. Referring to the inquiry authorized by the prime sponsor as a "witch hunt."

3. Asserting that the said inquiry was politically motivated.

4. Telling members of the Consortium Advisory Council that the Sangamon County Board "undermines" you.

E. Ineffective administration of the Sangamon-Cass Consortium CETA Program.

Austin presented the letter to Patkus and informed her that she had five minutes to remove her personal belongings from her office. The letter advised Patkus that she could appeal her termination to the Advisory Board. She did not make such an appeal.

## II.

◼ Patkus's first claim is that she was discharged in retaliation for actions that were protected by the First Amendment—the November 25th telegram to the DOL and her statements at the November 26th special meeting of the Advisory Council. In general, a public employee's exercise of his or her right to speak on matters of public concern may not furnish the basis for dismissal from public employment. *Pickering v. Board of Education of Township High School,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968). To succeed on her First Amendment claim, Patkus would have to prove that her actions and statements concerned matters of public concern and that her interests, as a citizen, in commenting upon these matters outweighed those of the state, as an employer, in promoting the efficiency of the public services performed through its employees. *Id.* at 568, 88 S.Ct. at 1734; *Egger v. Phillips,* 710 F.2d 292, 322 (7th Cir.) (en banc), *cert. denied,* — U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). In this case, the district court held that although the telegram to the DOL would constitute speech of public concern, her dismissal was for conduct that was not protected by the First Amendment. On appeal, Patkus argues that this ruling was in error and that,

under the *Pickering* analysis, her conduct should be protected.

■ The reasons behind an employment decision will not be scrutinized unless the speech or other conduct can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Determining whether an employee's speech addressed a matter of public concern is a legal, rather than a factual, inquiry, and the decision must be based on the content, form, and context of the statement in light of the entire record. *Id.* at 147–48 & n. 7, 103 S.Ct. at 1690–91 & n. 7. Prior to *Connick*, this court had noted that *Pickering* could be read to indicate that speech which does not involve matters of public interest is "not protected" by the First Amendment. *McGill v. Board of Education*, 602 F.2d 774, 777 (7th Cir.1979). In *Connick*, the Supreme Court clarified this issue by stating that even if speech does not touch on matters of public concern, it is not totally beyond the protection of the First Amendment. 461 U.S. at 147, 103 S.Ct. at 1690. However, personnel decisions taken in reaction to speech of only personal interest to the employee are not appropriate for review by federal courts, whether the employer is a state agency or a private enterprise. *Id.*[2] Therefore, we must first determine if Patkus's actions constituted speech of public concern or were merely actions of private and personal concern to her.

■ The November 25th telegram to the DOL, which alleges violations of federal regulations in a governmental investigation, must be considered initially as speech of public concern. A government employee has the right to make good-faith accusations of malfeasance in office, even when the accusations are against fellow workers. *Egger*, 710 F.2d at 322. However, her statements at the November 26th meeting

of the partial Advisory Council do not fit so readily into the recognized areas of public concern. Informing an entire Advisory Council of important matters relating to the program it oversees would clearly be action similar to that of sending the telegram. But the actions and statements that occurred here more nearly resemble a "mere extension" of Patkus's personal dispute with specific individuals. Actions of that sort were determined to be private and not matters of public concern in *Connick*. 461 U.S. at 148, 103 S.Ct. at 1690. The content of Patkus's statements consisted of accusations against the absent members and those involved in the Stratton investigation and admonitions that the Advisory Council should not question her actions or communicate with county officials; the form of the statements included terms such as "witch hunt"; and the context in which they were made was a meeting that quite literally created division in a body functioning within the county government. These statements to the Advisory Council go well beyond Patkus's interest, as a citizen, in commenting on matters of public concern, *see Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. *See also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8 (matters not otherwise of public concern do not attain that status because the subject matter could, in different circumstances, have been the topic of a communication of general interest to the public). Under the circumstances present here, we do not find that Patkus's act in calling the Advisory Council meeting and her statements at that meeting involve matters of public concern. *See Egger*, 710 F.2d at 317.

Further analysis is necessary under the *Pickering* test to determine if the state was justified in discharging Patkus despite the fact that the November 25th telegram has been determined to touch on matters of

---

**2.** Prior to *Connick*, this court had indicated that statements dealing exclusively with internal matters of the workplace or consisting of criticism of fellow employees implicate different, and less important, interests than would impersonal criticism of the institution generally. *Eg-*

*ger*, 710 F.2d at 316–17. *See also O'Brien v. Town of Caledonia*, 748 F.2d 403, 407 (7th Cir. 1984); *Ekanem v. Health and Hosp. Corp.*, 724 F.2d 563 (7th Cir.1983) *cert. denied*, —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984).

public concern. Even speech involving matters of public interest can legitimately lead to negative employment action if it is so disruptive as to impede the employee's performance of his or her job. *Connick*, 461 U.S. at 149–52, 103 S.Ct. at 1691–93; *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734; *McGill*, 602 F.2d at 777.

■ This court has summarized a number of the factors to be considered in deciding the extent to which an employer may legitimately take adverse employment action in these circumstances. They include the following: whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers, whether the employment relationship is one in which personal loyalty and confidence are necessary, whether the statement would damage the reputations of public officials or would foment controversy and conflict among those officials, whether the matter was one on which debate was vital to informed decisionmaking, and whether the speaker should be regarded simply as a member of the general public. *Yoggerst v. Stewart*, 623 F.2d 35, 40 (7th Cir.1980). The reviewing court is to look at the ordinary or foreseeable effect of the conduct in controversy and to determine whether it would be "reasonably calculated to create division or to have impaired discipline." *Id.*

■ The *Pickering* calculus requires us to look at the substance of the telegram and the time, place, and manner in which it was sent and to balance Patkus's interest in taking such a step against the interests of the county as an employer. *See Egger*, 710 F.2d at 316–18. Although a public employee may legitimately appeal to external authorities in connection with matters relating to the employment situation, it is important to note whether the authorities appealed to are the appropriate recipients for such communication. *O'Brien v. Town of Caledonia*, 748 F.2d 403, 407 (7th Cir. 1984). The contents of Patkus's telegram to DOL went well beyond what was necessary to alert the DOL to abuses into which it might rightfully inquire. The timing of

the telegram also raises some concern. Although it was Austin who had appointed Stratton, of whom the telegram complains extensively, Patkus only requested Austin's intervention on the same day she sent the telegram. The district court found that Patkus's failure to give Austin a chance to respond and act on the charges amounted to a failure to properly go through the line of authority, and we agree.

Further, the telegram contains statements likely to create division and controversy among officials of the county for whom Patkus worked; this is particularly true of the references to Stratton's affiliations with the Republican Party and the implication that some County Board members had become active in an improper way in the investigation. Although it may have been proper, or even necessary, for Patkus to raise questions about an investigation that was not being conducted properly, the disruptive effect of the way she chose to do so must be considered. *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972) (per curiam), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973).

More serious concerns are raised when it is remembered that one of Patkus's duties as administrator was to serve as a liaison between the county, of whom she was complaining, and the DOL, to whom these complaints were addressed. It is difficult to see how this action would allow her to continue to fulfill the duties of her job for the county. *See Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3; *Hostrop v. Board of Junior College District No. 515*, 471 F.2d 488, 492 (7th Cir.1972), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *Kiiskila v. Nichols*, 433 F.2d 745, 750 (7th Cir.1970). Patkus's own personal stake in the matter also cannot be ignored. When the speaker is directly involved in or affected by the issue being discussed, "additional weight must be given to the supervisor's view that [that] employee has threatened the authority of the employer." *Connick*, 461 U.S. at 153, 103 S.Ct. at 1693; *O'Brien*, 748 F.2d at 407.

The other incidents surrounding the telegram confirm the impression that Patkus was engaging in highly disruptive, conflict-creating behavior, even though she was speaking about an important matter of public concern. Under the *Pickering* balancing test, the telegram's substance and the time and manner of its sending were so disruptive of the employment relationship and the goals of the Consortium that its impact on the county's interests as an employer outweigh the interests of Patkus in speaking freely as a citizen.

### III.

■ Patkus also claims that her discharge was prohibited because it violated her First Amendment right of free association; she asserts that she was fired for purely political reasons, noting that the Republican Party became the controlling party of county government shortly before her dismissal and that her eventual successor was associated with that party. With notable exceptions,[3] dismissals of public employees for reasons of political patronage are violations of the First Amendment. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Livas v. Petka,* 711 F.2d 798, 800 (7th Cir.1983). As acknowledged by Patkus, the plaintiff bears the burden of establishing that political association was a motivating factor in bringing about the discharge. *Hermes v. Hein,* 742 F.2d 350 (7th Cir.1984). She has failed to make such a showing in this case. Patkus apparently concedes on appeal that the hiring procedures used to select her successor were politically neutral. The only indications of possible political motivation are the timing of the discharge and Patkus's own references to party affiliation in the telegram to DOL. Although the controlling party had recently changed at the time of her discharge, it is much more likely that the divisive incidents related above, rather than political concerns, influenced the decision. "A disgruntled employee fired for

legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter,* 653 F.2d 1164, 1168 (7th Cir. 1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). In this case, Patkus's claims that her discharge was politically motivated are no more than unsupported assertions.

### IV.

■ Patkus's claim of sex discrimination in her discharge also fails. Since the defendants' reasons for firing Patkus are supported by the evidence and are not prohibited by other constitutional provisions, they constitute legitimate, nondiscriminatory reasons for the discharge. The existence of such reasons would overcome a *prima facie* showing by the plaintiff, assuming such had been made, and would defeat the Title VII charges unless plaintiff could establish that they were merely a pretext. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Epstein v. Secretary, United States Department of Treasury,* 739 F.2d 274, 278–79 (7th Cir.1984). Plaintiff makes no attempt to show that the district court was clearly erroneous in ruling that the reasons given by defendants were not a pretext, *see Nellis v. Brown County,* 722 F.2d 853, 860 (7th Cir.1983), but instead argues that the defendants did not present evidence of direct disobedience of an order, a necessary element for a firing based on insubordination. This, she argues, fails to rebut the *prima facie* showing that the district court was willing to assume had been made. We note only that while defiance of a direct order is one way to establish that an employee has been insubordinate, none of the cases cited by Patkus in her brief hold that legitimate grounds for discharge

---

**3.** Public employees who occupy policy-making or confidential positions for which political considerations are "an appropriate requirement for the effective performance of the public office

involved" are excepted from the general rule set forth in *Elrod. Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980).

may not be given by other behavior of an employee that goes against the best interests of the employer. Regardless of the manner in which it is characterized, the defendants have established nonprohibited reasons for the discharge.

## V.

■ Patkus's equal pay claims under Title VII and the Equal Pay Act are based on evidence that she received less than other county department heads and that she was permanently replaced by two men, each of whom was paid a higher salary than she had received.[4] With regard to the differing salaries for county department heads, Patkus admits on appeal that she did not present evidence at trial to establish that the relevant positions required equal skill, effort, and responsibility. Her claim that Austin admitted that element is without merit; his testimony merely asserts that she was classified as a department head along with others in the organizational scheme of the county. Without a showing that she was paid less for a position that required substantially equal work, this part of the claim must fail, *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (Title VII); *EEOC v. Mercy Hospital and Medical Center*, 709 F.2d 1195, 1197 (7th Cir. 1983) (Equal Pay Act).

■ The portion of Patkus's claim that rests on the differential between her salary and that of her successors, however, does make out a *prima facie* case of a violation of the Equal Pay Act.[5] The salary paid to a successor who performs substantially the same work may provide a basis for an equal pay action. *Peltier v. City of Fargo*, 533 F.2d 374 (8th Cir.1976); *Di Salvo v. Chamber of Commerce of Greater Kansas City*, 416 F.Supp. 844 (W.D.Mo.1976), *modified on other grounds*, 568 F.2d 593 (8th Cir.1978).

■ Under the Equal Pay Act, the defendant may defend the pay differential by fitting into one of four exemptions: a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any factor other than sex. *Id.* at 277; 29 U.S.C. § 206(d)(1)(i)–(iv) (1982). The district court held that the defendants successfully rebutted the plaintiff's *prima facie* case on two bases: the higher educational qualifications held by her successor as administrator and the fact that the position and pay changes were based on a long-term reorganization plan. We focus consideration on the second factor, for the Equal Pay Act looks to the similarity of the actual duties involved, and does not turn on differences in job descriptions, prior training, or other factors. *EEOC v. Mercy Hospital and Medical Center*, 709 F.2d at 1197.

---

**4.** A separate incident involving Patkus's pay surfaced at trial. In March 1980, Patkus approached Austin and the chairman of the CETA committee regarding a raise. She was advised to seek additional funds for her position from Cass County, and she did so successfully. In May, the Sangamon County Board voted to reduce her salary by the amount she had obtained from Cass County—plus $100. The reasons for this move were that the increase was inflationary and that her application to Cass County was viewed as "acting against the intent of the Sangamon County Board." While this incident is indicative of some disharmony and lack of full support by the Board, Patkus does not show how it related to the claims of sex discrimination or wage disparity.

**5.** Title VII and the Equal Pay Act are to be construed "in harmony," *Grann v. City of Mad-*

*ison*, 738 F.2d 786, 788 n. 1 (7th Cir.1984) (citing *Orahood v. Board of Trustees*, 645 F.2d 651, 654 (8th Cir.1981)), *cert. denied,* —— U.S. ——, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984), even though Title VII requires a showing of discriminatory intent while the Equal Pay Act creates a type of strict liability in that no intent to discriminate need be shown. *Strecker v. Grand Forks County Social Service Board*, 640 F.2d 96, 99 (8th Cir. 1980). Since the four statutory defenses available under the Equal Pay Act also serve as valid defenses to a claim based on Title VII, *County of Washington v. Gunther*, 452 U.S. 161, 167 (1981); 42 U.S.C. § 2000e–2(h), however, and since we hold that defendants have successfully established a defense to the Equal Pay Act claim, there is no need to address the separate Title VII claim of discrimination in pay.

At trial, Patkus testified that she had recommended creation of an assistant administrator's position as early as September 1979 and that there had been discussions about upgrading the position of administrator even earlier. A proposed revision, containing both positions and the higher salary figures, was worked up by Patkus during the period from July through October 1980, and it was initially presented to the County Board during November 1980, prior to the incidents that triggered Patkus's discharge. It was either tabled or withdrawn at that meeting, for reasons that are not established, although Austin testified that he believed it was because of "some concerns" of the Advisory Committee. After Patkus's discharge, the selection committee chosen to interview possible successors was given the task of making any additional recommendations about salary ranges. The reorganization plan eventually adopted was substantially equivalent to the plan submitted by Patkus.

The question before this court is whether this occurrence would qualify as a "factor other than sex" justifying the pay differential. We are aware of no case that has addressed a similar situation. In *Di Salvo*, a male was hired, at a higher salary, to replace a female former employee only after the employer could find no woman to take the job at the original salary. The district court's ruling that this constituted a violation of the Equal Pay Act, 416 F.Supp. at 853, was later affirmed by the Eighth Circuit, 568 F.2d at 597. The facts of that case, however, demonstrate clearly that the elevation of salary for the position had not been planned or intended prior to the recruitment of the male successor. In contrast, the evidence here fully substantiates the intention of both Patkus's office and the Board's CETA Committee to request that the new plan be instituted; there is nothing to indicate that its eventual adoption was not anticipated. Further, there is nothing to indicate that the Board would not have given Patkus the higher salary if she had remained in the position of administrator *or* that her discharge was in any way connected to the anticipated change in structure and pay.

 As discussed earlier, Patkus's discharge was occasioned by the events of November 25 and 26, 1980. That the proposed reorganization was initially submitted prior to those dates and was only put into effect when her male successors were hired could, under some circumstances, raise questions about whether sex was a factor in the different salaries paid to different individuals. However, without some evidence to suggest an affirmative answer to those questions, we hesitate to hold that these facts alone establish an Equal Pay Act violation. Although an intent to discriminate is not necessary to establish a violation of 29 U.S.C. § 206 (see footnote 5), we are barred from finding an Equal Pay Act violation in the absence of some reason to connect the change in personnel to the implementation of the new plan. Petkus is asking, in effect, that we assume that different levels of pay given to members of different sexes creates an Equal Pay Act violation even when the change in pay results from a preplanned employment reorganization.

The "factor other than sex" exemption was intended by Congress to be a "broad general exception" and was added because of a concern that bona fide job-evaluation systems used by American businesses not be disrupted. *See County of Washington v. Gunther*, 452 U.S. 161, 172, 101 S.Ct. 2242, 2249, 68 L.Ed.2d 751 (1981) (and cases cited therein). We view the right of an employer to change and revise the job-evaluation and pay system in use as falling within this area of congressional concern. The effect of a contrary holding here would be to force employers either to forego legitimate organizational planning or to hire only someone of the same sex whenever an employee left a job, or was fired for unrelated reasons, at the critical time. Although the fact or timing of an employer reorganization may well deserve scrutiny, we find little reason to question that, in this case, the reorganization was a legit-

imate reason for the pay differential based on factors other than sex.

## VI.

■ The final issue in this case is Patkus's claim that her discharge constituted a violation of due process because it occurred without a pre-termination hearing. Due process analysis requires that there be state action sufficient to invoke the constitutional guarantee, a liberty or property interest to which the plaintiff has a claim of entitlement, and a determination of the amount of process which is due to protect that interest. *Holbrook v. Pitt,* 643 F.2d 1261, 1276–77 (7th Cir.1981). There is no dispute here that the defendants' discharge of Patkus provides sufficient governmental action. The district court held, however, that Patkus did not have a property right in her job as the Consortium's administrator.

### A. Existence of a Property Interest

A claim of entitlement is more than an "abstract need or desire" or a mere expectation on the part of the individual; it is a claim "on which people rely in their daily lives" and may be created "by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Patkus, who did not have a written employment contract, asserts that the independent source for her claim of entitlement lies in a requirement that she could only be dismissed "for cause." Defendants assert that there was no such limitation on their power to discharge her. The facts behind these assertions are, to say the least, confusing.

The Prime Sponsor Agreement (Agreement) between DOL and Sangamon and Cass Counties, which was originally approved by both parties in 1977, stated that Consortium employees "may only be discharged for cause" and that no Consortium

employee was to be exempt from either the merit system or the personnel procedures contained in the Agreement. Despite being a party to the Agreement, Sangamon County never adopted the personnel plan that was developed by Patkus's predecessor and approved by the relevant federal authorities. In 1979, DOL approved a modification of the Agreement that indicated the existence of a Sangamon-Cass Consortium Personnel Policy Manual (Policy Manual), a document developed by Patkus to replace the earlier plan. The Agreement's modification again indicated that "[n]o member of the Consortium staff will be exempt from the regulations contained in the Personnel Manual" and further indicated that Sangamon County intended to have the manual approved by the County Board.[6] Despite this renewed statement that Sangamon County subscribed to these personnel procedures and despite a regulation requiring such policies in order for the county to obtain federal funding, 29 C.F.R. § 98.14, the County Board still failed to formally adopt the Personnel Manual. These facts, therefore, provide at least surface support for both parties' claims: for Patkus's claim that the county had agreed to certain personnel procedures and that she had a right to rely on those conditions *and* defendants' claim that they were not bound because the county had never formally adopted the procedures.

Other facts produced at trial cloud the issue further. Both Patkus and her predecessor testified that the Policy Manual and its earlier counterpart were used to govern Consortium personnel actions, despite the lack of formal Board approval. On the other hand, it is clear from the record that Patkus knew there had been no formal adoption, and Patkus herself had affirmed, in writing, that the only legally effective document was the Sangamon County Employees Manual (Employees Manual), a county-approved document applicable to all county employees that contained no provi-

---

6. The county could have chosen to exempt certain staff members (typically higher-level administrators) from the terms of the Policy Manual according to DOL guidelines; however, both the Agreement and its modification contain explicit rejection of this option.

sions relevant to hiring and firing. In addition, Patkus's testimony established a number of cases in which she did not follow procedures required by the Policy Manual in making hiring decisions; the system was bypassed on these occasions, she testified, because Austin or someone in his office "instructed" her to hire certain people.[7] On the basis of these facts, we must determine whether Patkus had a legitimate claim of entitlement to her position.

A property interest arises if there are "rules or mutually explicit understandings" to support a claim of entitlement. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Here, it appears that there were two fairly explicit mutual understandings and that they support conflicting conclusions. Both Patkus and the county officials knew that the county had agreed to adopt federally required procedures and that that adoption was necessary in order to receive funds for the CETA program. At the same time, both parties knew that the provisions in question had not been adopted and were not, in fact, followed in all Consortium personnel decisions. In *Smith v. Board of Education of Urbana School District,* 708 F.2d 258 (7th Cir.1983), this court stated that a state government that dismisses one of its employees does not deprive him of "property" unless "the state earlier conferred upon him a right of continued employment by telling him, in a manner that made it reasonable for the employee to expect the state to stand behind its word, that it would continue to employ him." *Id.* at 261. Thus, as we concluded in that case, the ultimate question is whether the plaintiff has some right under the state law (here Illinois) to keep his or her job. *Id.* *See also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (sufficiency of the claim of entitlement must be decided by reference to state law).

■■■ Under Illinois law, as under federal standards, public employees who cannot

be dismissed except for cause have a property interest in their positions. *Powell v. Jones,* 56 Ill.2d 70, 305 N.E.2d 166 (1973). In the absence of any controlling state statute, extrinsic evidence of a policy or practice upon which a legitimate expectation of the continuation of a benefit can be based may provide a basis for the property right. *Danno v. Peterson,* 421 F.Supp. 950 (N.D.Ill.1976). In this case, Patkus argues that she had a legitimate expectation based on Sangamon County's agreement with DOL to enact the provisions contained in the Policy Manual. Defendants argue that the county's Employees Manual, which does not provide for dismissal-only-for-cause, established the lack of any such reasonable expectation.

■■■ Illinois law on the contractual effect of employers' stated and written policies is fairly well developed, although it appears to be undergoing some change at the present time. Traditionally, Illinois has treated announced and even written personnel policies as a gratuity that can leave the employer free to change or discontinue the policy at any time. *Sargent v. Illinois Institute of Technology,* 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1979). There have been two recognized exceptions to this rule when an employer would be held bound to his policies—when an express employment contract was construed as "subject to" the policies of the employer, *Piper v. Board of Trustees,* 99 Ill.App.3d 752, 760, 55 Ill.Dec. 287, 292, 426 N.E.2d 262, 267 (1981), and when there were terms suggesting mutuality of obligation and modification of a pre-existing employment contract, *Carter v. Kaskaskia Community Action Agency,* 24 Ill.App.3d 1056, 1059, 322 N.E.2d 574, 576 (1974). Recently, this general rule has been questioned and rejected by the Second Appellate Division. In *Kaiser v. Dixon,* 127 Ill.App.3d 251, 82 Ill.Dec. 275, 468 N.E.2d 822 (1984), the court noted the divergence of approaches used in different states and stated: "We

---

7. In a subsequent inquiry by the DOL, initiated by Patkus, Sangamon County was directed to repay funds to DOL in connection with six Consortium employees who had not been hired in accordance with proper procedures.

believe the better reasoned approach ... is that which binds the employer to the terms in its policy manual.... A policy manual of the type here cannot be allowed to create rights for employees ... which disintegrate when an employee attempts to exercise them." 82 Ill.Dec. at 284, 468 N.E.2d at 831. While noting that "[n]ot every utterance or general statement of policy by an employer will rise to a binding contractual obligation," the court held that a detailed manual adopted by the employer imposes enforceable obligations. *Id.*, 82 Ill.Dec. at 285, 468 N.E.2d at 832.

■ If an employer's stated policies do not prove to have contractual status, an Illinois employee may still recover under the theory of promissory estoppel. To be successful, the employee must show the following: 1) an unambiguous promise made to him, 2) reliance on that promise, 3) that the reliance was expected and foreseeable, and 4) injury resulting from that reliance. *S.M. Wilson & Co. v. Prepakt Concrete Co.*, 23 Ill.App.3d 137, 139, 318 N.E.2d 722, 724 (1974). *See generally Enis v. Continental Illinois National Bank and Trust Company of Chicago*, 582 F.Supp. 876 (N.D.Ill.1984); *Rynar v. Ciba-Geigy Corp.*, 560 F.Supp. 619 (N.D.Ill. 1983).

■ Illinois law, therefore, does not contain precedent directly on the question before us: whether a public employee may rely on formal promises made by her employer to the federal government, when those promises were never formally enacted by the employer and where the employer's enacted policy did not address the issue in question. The factors discussed in the state cases do, however, provide enough direction to allow us to hold that, in the very particular circumstances before us, the county's agreement to implement a dismissal-only-for-cause personnel policy provides sufficient basis for Patkus's "le-

gitimate expectation" of the continuation of her employment and that she did have a property right in her position as Consortium Administrator. *Compare Malcak v. Westchester Park District*, 754 F.2d 239 (7th Cir.1985) (Illinois law applied to specific facts to determine if state law would recognize a property interest).

In order that this holding may be seen in proper perspective, we will note the specific, and perhaps unique, facts that support it. First, the county's obligation to enact the policy at issue is unquestioned, as it is required by federal regulations (20 C.F.R. § 676.43 (1984)) for the receipt of CETA funds and as those funds had been received by the county for several years. Second, there was no reason for Patkus necessarily to question that the discharge-only-for-cause provision would not be adhered to; the only instances in which the regulatory provisions had been bypassed were hiring decisions. Third, there was every reason to believe that the county intended the provision to apply to the Consortium Administrator as well as to regular staff members; although the county had not formally adopted the Policy Manual, it had already made an explicit election in the Agreement not to exempt any Consortium employees from its terms. Fourth, the county's Employees Manual, which had been adopted by the County Board, did not contain any provisions that went against the discharge-only-for-cause provision or that established alternative dismissal procedures. In our judgment, these facts would give Patkus a viable cause of action under state law on either a theory of promissory estoppel or under the changing state law regarding express commitment to employment procedures made by employers.[8] We caution, however, that the facts of this case may well be unique.

**8.** Support for this position is provided by the treatment similar claims have been given in complaints handled by the DOL. The record discloses that when a prime sponsor argues that the agreed-to personnel procedures were not effective, for one reason or another, that argu-

ment does not alter the binding effect of the procedures set out in the written Agreement. If the personnel policy could and would be enforced against the county by DOL, it would not be unreasonable for Patkus to rely on the county's adherence to those procedures.

## B. Requirements of Due Process

Having found that Patkus has a property right in her continued employment, we turn from state law to federal constitutional law to assess the type and degree of procedural protection necessary in order to make any deprivation of that right comply with due process requirements. If defendants had formally adopted the required procedures, Patkus would have been afforded a documented statement of the cause for her dismissal and an opportunity to have a post-termination hearing. This does not, however, necessarily defeat her argument that constitutional due process requires that she receive a fair hearing prior to any dismissal. "[T]he dimensions of the procedural protections which attach to state law entitlements are defined by federal standards. When the federal standard is applied, the 'process that is due in a given instance may bear little or no resemblance to the original expectation.'" *Shango v. Jurich,* 681 F.2d 1091, 1101 (7th Cir.1982) (quoting *Bills v. Henderson,* 631 F.2d 1287, 1298 (6th Cir.1980)). The Supreme Court recently strongly reaffirmed the proposition that state procedures do not delineate the procedures required by due process. *Cleveland Board of Education v. Loudermill,* — U.S. —, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985).

■ *Loudermill* authoritatively sets out the procedure that would be required by due process in this and any similar case. Public employees who can only be dismissed for cause are entitled to oral or written notice of the charges against them, an explanation of the employer's evidence, and an opportunity to present their side of the story prior to their discharge. *Id.* at 1495. This court has also determined that in "a garden variety summary dismissal" (i.e., not an unusual situation where pre-deprivation procedures would be impossible or impracticable [9]), public employees are entitled to some form of pre-deprivation

inquiry. *Schultz v. Baumgart,* 738 F.2d 231, 237–38 (7th Cir.1984); *Smith v. Board of Education of Urbana School District,* 708 F.2d 258, 261 (7th Cir.1983). In the context of public employment, as we noted in *Schultz,* due process requires—at a minimum—prior notice of and the reasons for the discharge and a meaningful opportunity to respond prior to termination. 738 F.2d at 235. Patkus was therefore entitled to notice, an explanation of the charges against her, and a meaningful opportunity to present her version of the events before she could be discharged.

In summary, we hold that Patkus did have a vested property interest in the continuation of her position as administrator of the Consortium and that she was entitled to notice, explanation of the evidence against her, and an opportunity to be heard before she could be terminated from the position. On this issue only, we reverse the judgment of the district court.

## C. Remedy

■ Where there has been a justified deprivation of a protected interest through deficient procedures, the injury caused by the justified loss is not properly compensable under section 1983. *Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). In the case before us, there has been a thorough judicial inquiry into the reasons for Patkus's dismissal. The defendants have presented sufficient evidence to prove that she would have been discharged even if proper pre-deprivation procedures had been employed, and Patkus has presented no proof of particularized injury arising only from the denial of due process. Without proof of actual injury, the denial of procedural due process is actionable only for nominal damages. *Id.* at 266, 98 S.Ct. at 1053. Patkus is therefore entitled to nominal damages on her due process claim against defendants.

---

**9.** *See, e.g., Parrett v. City of Connersville,* 737 F.2d 690 (7th Cir.1984) (constructive discharge), *cert. dismissed,* — U.S. —, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985); *Altman v. Hurst,* 734 F.2d 1240 (7th Cir.) (incremental changes in working conditions), *cert. denied,* — U.S. —, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984).

The district court's judgment is affirmed with respect to Patkus's First Amendment, sex discrimination, and equal pay claims and reversed with respect to the due process claim.

AFFIRMED in part;

REVERSED in part.