**Michael M. GORMAN,
Plaintiff–Appellee,**

v.

**Renault ROBINSON, George C. Cramer,
and William T. Salem, Defendants–
Appellants.**

No. 91–2157.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1992.
Decided Oct. 9, 1992.

Edward R. Theobald (argued), Russell J. Luchtenburg, Chicago, Ill., for plaintiff-appellee.

Phillip H. Snelling, ACC (argued), Johnson, Schaaf, Jones & Snelling, Thomas E. Johnson, Anthony J. Fusco, Jr., Wilbert U. Allen, F. Willis Caruso, Marilyn T. Kuhr, Chicago Housing Authority, Chicago, Ill., for defendants-appellants.

Before CUDAHY, POSNER and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Plaintiff Michael Gorman brought this civil rights lawsuit against the defendants after they discharged him from his position at the Chicago Housing Authority ("CHA"). Gorman had worked at the CHA from 1965 until his discharge in 1986 and for most of that time he had acted as the CHA's Assistant Purchasing Agent. Gorman's complaint against the defendants alleges that they violated his rights of freedom of speech and due process by discharging him for his cooperation with FBI investigations of employee corruption at the CHA. The defendants have maintained that they discharged Gorman because he was not performing his job satisfactorily.

In a motion for summary judgment, the defendants argued that the doctrine of qualified immunity shielded them from suit. They argued that they could not have reasonably known in 1986 that Gorman's communications with the FBI were protected by the First Amendment and that a review of the undisputed facts would demonstrate that Gorman was discharged because of his poor performance. As for Gorman's due process claim, the defendants maintained that Gorman could not demonstrate a property interest in his position or that he received constitutionally deficient process upon termination. The district court denied the defendants' motion for summary judgment because it concluded that there were genuine issues of material fact, which would require a trial. The defendants then brought this interlocutory appeal pursuant to 28 U.S.C. § 1291 in which they renew their arguments that they are entitled to qualified immunity.

Before we address their arguments, we will briefly review the facts.

## I.

In 1965, the CHA hired Gorman as a civil engineer. By 1968, Gorman had been promoted to Assistant Purchasing Agent, a position in which he served until 1983 when his superior became ill and he became the Acting Purchasing Agent. At that time, he reported directly to Andrew Mooney, the CHA's Executive Director and a member of the CHA Board. In 1984, Zirl Smith replaced Mooney as CHA's Executive Director.

In 1982, the FBI began investigating substantial thefts of CHA property and was considering the possibility that CHA employees were responsible. Gorman, whose brother was an FBI agent, assisted the investigation by informing the FBI of unusual ordering patterns of paint and tiles from the CHA's Central Maintenance Department. Gorman also claims that he informed FBI agents that certain CHA employees were receiving kickbacks. In 1985, Gorman testified as a witness for the United States in a criminal trial concerning the thefts which resulted in the conviction of several CHA employees. Gorman claims that he continued to assist the FBI investigation until 1986.

In 1984, Gorman began having problems with his superiors. He alleges that defendant Renault Robinson, who was then the Chairman of the CHA Board, began to encourage Smith, the CHA's Executive Director, to fire him. For the first time in his career, Gorman also began to receive unsatisfactory evaluations concerning his work performance. Prior to that time all of his evaluations had been satisfactory.[1]

At Robinson's direction, the CHA in 1984 had created a new position entitled Deputy Executive Director for Finance and Administration which was to supervise the Purchasing Department. Robinson appointed defendant George Cramer to serve in this

---

1. CHA employees are rated "satisfactory" or "unsatisfactory" on performance reviews. There are no other categories.

position and Cramer was to report directly to Robinson.

In 1985, the CHA changed the name of the Purchasing Department to Procurement and Inventory Control. Although Gorman's title changed from Acting Purchasing Agent to Acting Director of Procurement and Inventory Control, his job duties and responsibilities remained the same. In September, Gorman received a satisfactory performance evaluation and a pay increase. Gorman alleges that despite the positive review Robinson continued to encourage Smith to fire him.

In April 1986, the CHA began seeking applicants for the position of Director of Procurement and Inventory Control. Cramer had amended the job description of that position to include a preference for an MBA or CPA degree. Gorman, who had neither degree, applied for the position but was not interviewed. Instead, the CHA hired defendant William Salem and Gorman remained in the position of Assistant Director.

Gorman alleges that after Salem assumed the Director's position, Salem asked him about his cooperation with the FBI. Gorman told Salem that he had assisted the FBI in its investigation of CHA corruption, but he also informed Salem he was not at liberty to discuss the nature and status of the investigation.

Shortly after his meeting with Salem, Gorman began receiving memos from Salem which questioned the quality of his work. Salem also met with Gorman to discuss the alleged problems with Gorman's work. Salem eventually placed Gorman on probationary status.

On December 1, 1986, CHA Executive Director Smith requested that Gorman be transferred to his department. Smith hoped to assign Gorman to the new position of Contract Administrator in the Executive Director's Office. In this capacity, Gorman was to oversee contract procedures as well as to act as a liaison with the FBI.

That same day, Defendants Salem and Cramer prepared a memo critical of Gorman's job performance and ordered his immediate suspension pending termination. Accordingly, they did not transfer Gorman to the office of the Executive Director. On December 2, 1986, Salem called Gorman into his office, read him a memo which stated that he had been suspended pending final action. At this meeting, the CHA's Director of Human Resources told Gorman that he had a right to a hearing within 10 days if he so requested, at which time he could respond to the suspension before he was terminated.

Smith was not pleased with Cramer and Salem. On December 2, 1986, Smith wrote to Cramer and demanded that Cramer explain why Gorman had been suspended. Smith labeled Cramer's actions as "capricious and punitive." Cramer did not respond.

On December 10, Gorman requested a pre-termination hearing concerning his suspension. Thirteen days later, Gorman received a formal termination notice which advised him that he could contact the CHA's Director of Human Resources to schedule a date on which he could review his personnel file and set a date for his termination hearing. No hearing was ever held.

## II.

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages. *Conner v. Reinhard*, 847 F.2d 384, 387 (7th Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). That doctrine is based upon the recognition that permitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Conner*, 847 F.2d at 387. However, courts have also recognized that an action for damages may provide a citizen with his only means of vindication when an official has violated his constitutional rights. *Con-*

*ner,* 847 F.2d at 387. As a result, it is well settled that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ To determine whether the constitutional right alleged to have been violated was clearly established, "it must be identified in a particularized sense with respect to the circumstances of the alleged violation." *Warlick v. Cross,* 969 F.2d 303, 309 (7th Cir.1992); *Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3039. As the Supreme Court in *Anderson* admonished:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *but it is to say that in light of pre-existing law the unlawfulness must be apparent.*

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citation omitted) (emphasis added); *see also Conner,* 847 F.2d at 388. Again, we inquire " 'whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted.' " *Warlick,* 969 F.2d at 309 (quoting *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir.1987)).

■ The Supreme Court has made clear that qualified immunity is an immunity from suit rather than a defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 529, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). In *Mitchell,* the court held that "a district court's denial of qualified immunity, *to the extent that it turns on an issue of law,* is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Id.* at 530, 105 S.Ct. at 2817 (emphasis added).

■ We review the district court's denial of summary judgment *de novo* to determine whether we can decide each immunity question without resolving any disputed question of fact. *Hansen v. Bennett,* 948 F.2d 397, 399 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992); *Jackson v. Elrod,* 881 F.2d 441, 443 (7th Cir.1989). If we cannot resolve an issue without deciding a question of fact, then we lack jurisdiction over the appeal of that question. *Hansen,* 948 F.2d at 399. If we can decide an issue as a question of law, then we have jurisdiction over that issue. *Id.; Hannon v. Turnage,* 892 F.2d 653, 654 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).

In *Elliott v. Thomas,* 937 F.2d 338 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992), we clarified the distinction between questions of law and fact, which governs our jurisdiction over this interlocutory appeal. In *Elliott,* we noted that "[b]y sleight of hand you can turn any defense on the merits into a defense of qualified immunity." *Id.* at 341. We reasoned that the Supreme Court in *Mitchell* did not authorize a pre-trial appeal by every defendant to argue that " 'we didn't do it.' " *Elliott,* 937 F.2d at 342 (citing cases). Instead, a defendant must present a legal issue, such as an argument that "he acted in the shadow of legal uncertainty." *Id.*

### III.

We will begin with Gorman's First Amendment claim that he was discharged in retaliation for his cooperation with the FBI in its criminal investigation of CHA personnel. To recover on a First Amendment retaliation claim, a plaintiff must prove " '(1) that speech [he] engaged in was constitutionally protected under the circumstances, ... and (2) that defendants retaliated against [him] because of that speech.' " *Caldwell v. City of Elwood, Ind.,* 959 F.2d 670, 672 (7th Cir.1992) (quoting *Barkoo v. Melby,* 901 F.2d 613, 617 (7th Cir.1990)). To prove that certain speech was constitutionally protected a plaintiff must demonstrate that his speech involved

matters of public concern.[2] *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Next, the plaintiff must show that "his interests, as a citizen, in commenting upon these matters outweighed those of the state, as an employer, in promoting the efficiency of the public services performed through its employees." *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1256 (7th Cir. 1985); *Pickering v. Board of Education of Township High School,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); *Biggs v. Village of Dupo,* 892 F.2d 1298, 1301 (7th Cir.1990).

■ We will first examine the defendants' causation argument. The defendants have maintained that a review of the record demonstrates that they discharged Gorman because of his poor performance. In their appellate briefs, they have made exhaustive arguments that the undisputed facts do not support an inference that Gorman was discharged because of his cooperation with the FBI. They also insist that the undisputed evidence establishes that Gorman would have been discharged even if he had not cooperated with the FBI.

We agree with Gorman that under *Elliott* we cannot determine the validity of these highly factual "we didn't do it" arguments. If we were to resolve these questions, we would be required to decide the appeal of every public defendant whose summary judgment motion (based upon qualified immunity) is denied. Therefore, we lack jurisdiction over this portion of the defendants' appeal on the First Amendment claim. *See Elliott,* 937 F.2d at 341–42.

■ The defendants next argue that they are entitled to qualified immunity because the law was unclear in 1986 that Gorman's communications with the FBI were protected under the First Amendment. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Initially, we view their argument with some skepticism because courts have long recognized that an employer may not retaliate against an employee for expressing his views about matters of public concern. *See Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737; *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Myers,* 461 U.S. at 140, 103 S.Ct. at 1686; *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987).

■ There are two cases from this circuit pre-dating 1986 which established that a plaintiff's speech on matters of public concern was protected. In *Conner,* the plaintiff, a city employee, objected to several city policies at a Board of Ethics meeting and was terminated by the defendants. 847 F.2d at 386–87. We held that the defendants could not obtain qualified immunity because the plaintiff's speech was protected *in 1982* under the First Amendment. *Id.* at 393. In so holding, we concluded that Supreme Court and Seventh Circuit precedent clearly established that the plaintiff "had a right to speak as a private citizen on a matter of public concern at the Board of Ethics meeting *in May 1982."* *Id.* (emphasis added). The defendants have not argued that our holding in *Conner* is no longer good law. *See also O'Brien v. Town of Caledonia,* 748 F.2d 403, 407–08 (7th Cir.1984) (holding that complaints about alleged official misconduct to proper authorities constituted protected activities under the First Amendment).

The defendants rely on several cases in which we upheld the termination of employees who claimed that their First Amendment rights were violated. Accordingly, the defendants argue that it was unclear in 1986 that they were barred from terminating Gorman based upon his communications with the FBI. They argue that the facts of this case are similar to those of *Patkus.* In *Patkus,* the plaintiff alleged that she was terminated because she complained to the Department of Labor about an investigation handled by an attorney for the defendant consortium. 769 F.2d at 1258. We upheld the discharge on

---

**2.** The defendants do not dispute that Gorman's communications with the FBI involved matters of public concern. The public would clearly wish to learn of any criminal activities within the CHA.

the ground that the plaintiff's statements did not involve matters of public concern. *Id.* at 1257. We reasoned that the plaintiff's statements really concerned her personal dispute with specific employees of the consortium. The defendants accuse Gorman of insubordination and point to his refusal to discuss his cooperation with the FBI with Salem, after Salem had been appointed Director of Procurement. According to the defendants, Gorman was offended that Salem—instead of himself—had been named Director of Procurement. As we noted above, we cannot resolve this factual dispute on appeal. *Elliott*, 937 F.2d at 344–45.

The defendants also rely on *Jennings v. Tinley Park Community Consolidated School District 146*, 864 F.2d 1368 (7th Cir.1988). In *Jennings*, the plaintiff, who was the secretary to the superintendent of the defendant school district, led a protest against perceived sex discrimination by the school board in its wage scales. *Id.* at 1369. The plaintiff, however, revealed confidential information to certain board members without obtaining the permission of the principal or her supervisor. *Id.* at 1370. We upheld the actions of the defendants because the plaintiff's actions were deliberately designed to undermine her superior's ability to perform his job. *Id.* at 1374–75. *Breuer v. Hart*, 909 F.2d 1035 (7th Cir.1990), is also distinguishable. In *Breuer*, the plaintiff, a police officer, had accused his superior of misconduct. *Id.* at 1036–37. We held that the disruption caused by the plaintiff's accusations of wrongdoing in the police department justified his termination. *Id.* at 1041–42. We cannot agree with the defendants that Gorman's communications with the FBI disrupted the activities of the CHA or that Gorman sought to undermine the authority of his superiors.

As the defendants concede, Gorman's communications to the FBI concerning crimes by CHA employees would be of great concern to the public. We conclude that the balance under *Myers, Pickering*, and *Conner* clearly favored Gorman's right to disclose criminal activities of CHA employees against the CHA's interest in maintaining organizational harmony. Any reasonable public official would have been aware that in 1986 Gorman's statements in this context were protected under the First Amendment. Nevertheless, our holding does not preclude the defendants from raising their various factual arguments at trial.

### IV.

█ We now turn to Gorman's due process claim. To recover on a procedural due process claim, a plaintiff must prove that he has a protectible property interest in his employment. *Carston v. County of Cook*, 962 F.2d 749, 751 (7th Cir.1992). A property interest in employment "arises if there are 'rules of mutually explicit understandings' to support a claim of entitlement." *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1263 (7th Cir.1992) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972)); *see also Carston*, 962 F.2d at 751. In *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Supreme Court made clear that "the sufficiency of the claim of entitlement must be determined by reference to state law." *Id.* at 344, 96 S.Ct. at 2077; *see also Carston*, 962 F.2d at 751. Thus, we must determine whether Illinois law created a property interest in Gorman's employment. If Gorman establishes that he had a property interest in his employment, he must next demonstrate that the procedures afforded to him were inadequate.

█ Gorman argues that CHA Circular 799, which is a part of the CHA's handbook for personnel, created a property interest in his employment. He does not argue that an Illinois statute conferred a property interest in his employment or that CHA policy created an employment contract. *See Duldulao v. Saint Mary of Nazareth Hospital*, 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987). Gorman founds his claim on a clearly implied promise of continued employment. "When government gives its employees assurances of continued employment a constitutionally protected property interest arises." *Hannon*, 892

F.2d at 656; *see also Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Lee v. County of Cook*, 862 F.2d 139, 141 (7th Cir.1988); *Patkus*, 769 F.2d at 1263.

Whether Gorman had a property interest in his employment is governed by CHA Circular 799, which contains the CHA's discipline and termination policy. The defendants argue that the law was unclear in 1986 that Circular 799 conferred such an interest upon Gorman.[3] CHA Circular No. 799 provides in part:

> To assure fair employment and disciplinary practices in terms of equity, appropriate and standard involuntary separation practices and procedures and to maintain management's right to separate employees for *just cause*, the following policy is effective immediately: ....

(Emphasis added). The remainder of Circular 799 contains procedures which apply when an employee may be terminated. It requires that an employee should first be advised of any infraction committed and then should receive a formal warning "if the employee persists in exhibiting infractions...." Then the supervisor may request that the employee be placed on probation. If an employee is suspended without pay pending investigation, Circular 799 requires that an impartial investigation be conducted of the events leading to the suspension. The investigation may not be carried out by the suspending supervisor. The investigators are required to prepare a report and forward it to the Director of Personnel for review.

The defendants have not cited to the court any Illinois statute which conflicts with Circular 799 and we conclude that

Gorman had a property interest in his job based on CHA Circular No. 799. The just cause provision accompanying the procedures contained in Circular 799 was an assurance of continued employment. *Hannon*, 892 F.2d at 656; *see also Roth*, 408 U.S. at 577, 92 S.Ct. at 2705; *Patkus*, 769 F.2d at 1263.[4]

█ Next, the defendants argue that in 1986 the law was not clearly established that the procedures afforded plaintiff violated due process. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that "the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* 470 U.S. at 546, 105 S.Ct. at 1495.

The defendants argue that under any review of the undisputed facts Gorman clearly received adequate process. However, we agree with Gorman that there are material issues of fact which will require a trial. The December 1, 1986 memo to Gorman stated that:

> Your performance over the past five and one-half months, which required corrective action, as the memos presented to you have indicated, has been unsatisfactory. I find that there are substantial areas that have not been corrected and, as a result, you are being recommended for termination, based on the following:
> 1. Failure to follow rules, regulations, policies and procedures of the Chicago Housing Authority.
> 2. Unsatisfactory performance of duties.

---

**3.** With respect to the due process claim, the district court denied qualified immunity on the basis that a genuine issue of material fact existed as to whether CHA Circular 799 was validly passed by the CHA Board. On appeal, the defendants have conceded that Circular 799 was validly passed by the CHA Board.

**4.** This case is unlike *Hadley v. County of DuPage*, 715 F.2d 1238 (7th Cir.1983), in which the plaintiff, a county employee, alleged that his due process rights had been violated when he was terminated without a hearing. *Id.* at 1240. We held that even if the plaintiff could establish

a right to a hearing before termination, that alone would not establish a property interest cognizable under the Fourteenth Amendment. *Id.* at 1244. This case is different because Gorman was entitled to termination only for "just cause." In our view, Gorman had much more than a right to a hearing before termination. *See Panozzo v. Rhoads*, 905 F.2d 135, 138 (7th Cir.1990) (finding that a municipal policy which required certain procedures before any termination and required that termination would only be for cause created a cognizable property interest).

3. Insubordination.

4. Other acts of a serious nature that are detrimental to the Procurement and Inventory Control Department and the Chicago Housing Authority.

According to Gorman, Salem, who read the memo to Gorman, failed to provide any other specific facts or evidence to support the vague reasons in the memo. The memo also failed to reveal which alleged faults, described in previous memos, Gorman had failed to correct.[5] We agree with the district court that this boilerplate notice failed to convey to Gorman the specific reasons for his discharge. *See Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495.

We also agree with the district court that Gorman was apparently not given an opportunity to respond to the notice of termination. At the December 2, 1986 meeting between the defendants and Gorman, the CHA's Director of Personnel informed Gorman that he had a right to a hearing within 10 days, at which he could respond to the charges made in the memo before final action would be taken. Gorman made a written request for a hearing on December 10 but was not offered a hearing. He also called the Personnel Director and left a message, but she did not return his call. Instead, Gorman received a termination notice dated December 15. The defendants dispute the facts and claim that Gorman should have been more persistent in requesting a hearing. But this question presents a factual dispute, which we cannot resolve. *Elliott,* 937 F.2d at 342. We agree with the district court that Gorman has introduced sufficient evidence to show that the defendants have not afforded him due process.

In conclusion: 1) on Gorman's First Amendment claim we lack jurisdiction over the defendants' "we didn't do it" argument; 2) the defendants' arguments in favor of qualified immunity with respect to that claim are without merit; 3) on Gorman's due process claim, we conclude that he had a property interest in his employment and we also conclude that there is an issue of material fact as to whether he received

adequate process. Therefore, we lack jurisdiction over this appeal.

The appeal of the defendants is DIS-MISSED.

---

5. Gorman has also alleged that Salem falsely criticized Gorman in the prior memos.