796 F.2d 962
 41 Fair Empl.Prac.Cas. 497,
41 Empl. Prac. Dec. P 36,421, 33 Ed. Law Rep. 1060
 Kathryn M. JENNINGS, Plaintiff-Appellant,
v.
TINLEY PARK COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 146;
Robert W. Procunier, Superintendent of Community
Consolidated School District No. 146; and the Board of
Education of Community Consolidated School District No. 146,
Defendants-Appellees.
 No. 85-1916.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 13, 1986.
Decided July 21, 1986.
 
 Diane I. Jennings, Lord, Bissell & Brook, Chicago, Ill., for plaintiff-appellant.
 David P. Kula, Scariano, Kula & Ellch, Chtd., Chicago Heights, Ill., for defendants-appellees.
 Before CUDAHY and COFFEY, Circuit Judges, and EVANS, District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiff, Kathryn Jennings, brought a Title VII action against defendants alleging that 1) her employer's policy, which denied overtime wages to secretaries, who were all female, but granted overtime wages to custodians, who were all male, discriminated on the basis of sex; and 2) her discharge was in retaliation for her participation in preparing and delivering a salary study to the Board of Education. The district court ruled for defendants on both claims. We affirm the district court on the underlying Title VII claim and vacate the judgment on the retaliation claim and remand this branch of the case for a new determination.
 
 I.
 
 2
 Jennings served as a secretary to Robert Procunier, Superintendent for Tinley Park Community Consolidated School District No. 146, from November 1973 until June 1979. During that period District 146 employed two groups of employees that it designated as "Class I" employees, secretaries and custodians. "Class I" employees were noncertified,[1] full-time, salaried employees. All secretaries were female; all custodians were male. Custodians were paid one and one-half times their hourly rate for overtime work. Before a custodian was paid overtime his supervisor had to authorize the overtime work. Secretaries were not paid for overtime work. Defendants argued that this was because the secretaries were never required to work overtime.
 
 
 3
 Beginning in February 1979 the secretaries expressed concern that they were not being paid for overtime, which they asserted that they did in fact perform. The secretaries organized themselves into a "secretarial group" and attempted to meet with Procunier. Procunier refused to meet with the secretaries, but he was aware of their concerns from discussions he had had with Jennings. The secretaries did, however, meet with Assistant Superintendent Noel Swinford. The secretaries also attended a Board meeting to express their opposition to a salary schedule promulgated by Procunier. Despite their efforts, the Board passed the salary schedule. In response, the secretaries prepared a salary study, of which Jennings was the primary drafter. The study was delivered to the Board and Procunier on June 1, 1979.
 
 
 4
 Subsequently Procunier expressed his displeasure at not having received a copy of the study in advance of its distribution to the Board. The working relationship between Procunier and Jennings changed. He became distant. He stopped his practice of going through the mail with Jennings and even removed a chair from his office so that she would have no place to sit. He instructed her not to answer calls on his personal telephone line.
 
 
 5
 On June 15 Procunier told Jennings that she had not been loyal and supportive and that he would recommend to the Board that she be terminated. The Board left the matter to Procunier's discretion. The reasons for her discharge were explained in a letter:
 
 
 6
 It is with considerable reluctance that I terminate your employment as my secretary. Although your technical and professional competence have been outstanding throughout the period of your employment, events of the past 2-3 weeks have generated serious questions relative to your ability to serve me or the Board of Education in an effective manner as required.
 
 
 7
 The very important element of mutual trust and support which is so essential in the relationship of a personal secretary to the administrator responsible for an operation similar to this school district, has been seriously undermined. As a result of your reluctance to inform me of actions which you and other secretaries took relative to communication with the Board of Education, you have created a situation which is antagonistic to the close, confidential working relationship which is necessary in this office. The deterioration of the level of trust and support leaves no alternative open to me.
 
 
 8
 It was stipulated that Jennings demonstrated outstanding skills, performed her work well and that defendant had no reason to fire her based on her job performance. Plaintiff continued to perform her work competently after June 1 and Procunier had no reason to believe that she would disseminate confidential material.
 
 
 9
 Plaintiff brought an action under Title VII. Count I of her Amended Complaint alleged that she had been subjected to unfavorable disparate treatment based on sex. Count II alleged that she was terminated in retaliation for her opposition to the allegedly disparate treatment. Count III alleged the same discriminatory acts on behalf of similarly situated individuals. Class certification was granted. The case was tried before Judge McMillen sitting without a jury in May 1985. At the close of all the evidence he entered judgment for defendants on all counts. No written findings of fact or conclusions of law were made.
 
 II.
 
 10
 Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. Sec. 2000e-2(a)(1). In County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court held that a plaintiff may state a claim of sex-based discrimination in compensation under Title VII without proving that he or she was performing a job substantially equal to that held by a higher-paid member of the opposite sex. See Boyd v. Madison County Mutual Insurance Co., 653 F.2d 1173, 1177 (7th Cir.1981), cert. denied, 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982). However, neither Gunther nor Boyd set forth the elements of a prima facie case of sex discrimination when the plaintiff alleges that one category of employees of one sex is discriminatorily denied a benefit that is extended to another category of employees of the opposite sex. See Gunther, 452 U.S. at 166 n. 8, 101 S.Ct. at 2246 n. 8.
 
 
 11
 It is likely, although perhaps not beyond dispute, that plaintiffs have established a prima facie case. In Boyd an insurance company classified its employees as management personnel, claims adjustors or clerical workers. Both the management personnel and the claims adjustors were considered "professional" employees. All of those positions were filled by men. All of the clerical employees were women. The insurance company adopted a policy under which attendance bonuses were paid to clerical employees, but not to the other employees. Plaintiff, one of the management personnel, alleged that this policy discriminated against him on the basis of his sex in violation of Title VII. We held that plaintiff had established a prima facie case of sex discrimination. "Women were eligible for bonuses. Men were not." Boyd, 653 F.2d at 1178. Similarly, plaintiffs in the case before us have gone a long way toward establishing a prima facie case. All of the secretaries were women; all of the custodians men. Custodians were paid overtime. Secretaries were not.[2]
 
 
 12
 Once a prima facie case is established, the burden shifts to the defendant to show that the difference in treatment was based on a legitimate, nondiscriminatory reason. See Boyd, 653 F.2d at 1178. If the defendant successfully carries this burden, then the plaintiff may demonstrate that the offered reason is merely a pretext for discrimination. Id.
 
 
 13
 The district court apparently thought that defendant had established a legitimate, nondiscriminatory reason for paying custodians for overtime but not secretaries. The district court found that "the type of work [secretaries] do is different and the reasons the custodians are required to stay over is [sic] different from the reason that the secretaries stay over, whether required as a matter of practice or simply as a voluntary act." Tr. at 363.
 
 
 14
 [Custodians] have to do their work before they go home in order to have the school ready for work the next day.... So that if a storm comes or if there happens to be some vandalism or perhaps just an unduly dirty classroom, those employees can be asked to stay overtime [to remove snow from sidewalks or to clean the school].
 
 
 15
 Tr. at 361. The district court found that the secretaries are in a different situation.
 
 
 16
 Now, as far as the secretaries are concerned, the evidence is that they are seldom, if ever, requested to stay overtime and that they can get their work done during the seven and a half or eight hours that they are in the school building. If they don't get it done on the one day, they can do it on the next day. On the other hand, I don't attach too much significance to the fact that secretaries in many instances, can't get their work done in seven and half hours--Mrs. Gerrisen's testimony was rather clear to that effect--and that they stay over in order to finish it. I don't consider that entirely voluntary.
 
 
 17
 Tr. at 363.
 
 
 18
 Although the findings of the district court are not as clear as they might be, we shall attempt to interpret and restate them. The requirement for custodians to work overtime was exigent--there was a specific overtime requirement to correct immediately a condition that would obviously interfere currently with efficient operation of the school. That is, an unshoveled sidewalk, a vandalized building or a dirty classroom presented an exigent problem calling for immediate action (even on overtime) to remove an obvious obstacle to school operations.
 
 
 19
 On the other hand, whatever overtime requirement was imposed on secretaries resulted from their having more work to do than could be completed during their regular work hours. The district court notes that in most cases they could put work off until the next day. There was no specific demand for work to be done now to permit the school to function. We believe that the district court's various comments on the demands of secretarial work may be characterized as suggesting only this sort of overtime requirement, if there was one at all.
 
 
 20
 We think these two distinct sorts of job requirements could call for different responses from management, which would have been based on legitimate and nondiscriminatory reasons. At least, we think the trier of fact could find the reasons to be legitimate, nondiscriminatory and nonpretextual and we may not conclude that his determination is clearly erroneous. Thus the treatment of custodians vis-a-vis secretaries may not have been good personnel management--or even entirely fair--but we think the district court could find that it did not implicate Title VII. We think this conclusion is also suggested by the fact that plaintiff did not show that all of the relevant employees were subject to disparate treatment, even though we have not held that such a showing is always necessary to establish a prima facie case. See supra note 2.
 
 III.
 
 21
 Plaintiff's second claim is that she was discharged in retaliation for her opposition to defendant's employment practices. Title VII provides:
 
 
 22
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 23
 42 U.S.C. Sec. 2000e-3(a). To determine whether there has been a retaliatory discharge under this section, a court must assess the evidence by using the three-part procedure set forth by the Supreme Court in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973). See Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir.1985). First, the plaintiff must prove a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. Third, if the defendant carries its burden, the plaintiff has an opportunity to prove that the stated reason was not the defendant's true reason for acting, but was a pretext for discrimination.
 
 
 24
 To establish a prima facie case of retaliatory discharge, the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that there is a causal link between the protected expression and the adverse action. See Klein, 766 F.2d at 280; EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1012 (9th Cir.1983). Section 2000e-3 does not require that the challenged employment practice actually violate Title VII; it is sufficient if the plaintiff has a reasonable belief that there is a Title VII violation. See Berg v. La Crosse Cooler Co., 612 F.2d 1041, 1045-46 (7th Cir.1980). The district court found that plaintiff had established a prima facie case. Defendant argues, however, that the necessary causal link was not established because Procunier was not aware that plaintiff had drafted the salary study. However, Jennings gave a copy of the salary study to Procunier on June 1 and thus he was aware of her involvement with the study. Further, the copy of the study that Procunier received had Jennings' signature on the front as one of the "Committee of Concerned Secretaries." Procunier therefore had reason to be aware of her involvement in drafting the study. In any case we do not find the district court's implied factual finding that there was a causal link clearly erroneous.
 
 
 25
 The crux of the disagreement between the parties centers on whether defendant articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal. Defendant argues that Jennings was fired because she failed to inform the Superintendent of the existence of the study and its delivery to the Board, and consequently he felt that he could no longer trust her and count on her loyalty.[3] Plaintiff argues that this is not a legitimate, nondiscriminatory reason under section 2000e-3.
 
 
 26
 We note initially that the district court may have used the wrong standard to determine whether defendant had carried its burden under part two of the Burdine test. The district court seems to take the position that any reason offered by the defendant is sufficient to discharge its burden and to shift the burden to the plaintiff to prove that the reason is a pretext.[4] Defendant, however, may not offer merely any nondiscriminatory reason for the discharge. Defendant must offer a legitimate reason. It is unclear whether the district court thought that the defendant had offered a legitimate, nondiscriminatory reason.[5] Consequently, we think that the more prudent course of action is to remand the retaliation claim to the district court so that it may be reconsidered in light of our observations.
 
 
 27
 Further, we think that there is some reason to doubt whether defendant presented a legitimate, nondiscriminatory reason for the discharge. As the Ninth Circuit has noted, almost every form of opposition to an employment practice is in some sense disloyal. See EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir.1983). If mere "disloyal" conduct could provide a legitimate basis for discharge, the protection extended by section 2000e-3 would be severely limited.
 
 
 28
 In Crown Zellerbach the defendant was to receive an award from the Los Angeles School District, a significant customer, for a project funded by Crown Zellerbach that was designated to provide special career guidance for students in a predominantly Hispanic school. The plaintiffs, who were employees of Crown Zellerbach, wrote a letter to the school board to inform it of "the bigoted position of racism at Zellerbach" and of various discrimination charges that had been filed against the company. The defendant fired the plaintiffs for "disloyalty." We think that Crown Zellerbach is markedly similar to the case before us.
 
 
 29
 The Ninth Circuit applied a reasonableness test to determine whether the conduct could provide a legitimate basis for discharge. The court, in holding for the plaintiffs, distinguished an earlier case that had held that an act of disloyalty may provide a sufficient basis for discharge. In the earlier case the plaintiff's actions had "resulted in poor work performance by her and also in diminished performance and reduced morale in other employees who worked with her.... [She] would have been fired based on her employment performance alone even had she not opposed the institute's employment practices." Crown Zellerbach, 720 F.2d at 1014-15 (footnote omitted).
 
 
 30
 Defendant argues that Jennings' failure to inform Procunier of the study was "fatally disruptive to the operations of the District and the relationship between Plaintiff and Defendant." We agree that there appears to have been some disruption. However, any disruption may be viewed as the product of Procunier's reaction to plaintiff's conduct, not necessarily of plaintiff's conduct itself. We do not find any evidence that Jennings' performed her job any less competently. Defendant also argues that plaintiff's actions were disruptive because they caused Procunier to lose trust in her. This argument is an attempt to say that "disloyal" conduct is always disruptive, and therefore a justification for discharge, at least as long as defendant claims that trust is a job requirement and he or she has lost trust. This argument, if adopted, would undermine section 2000e-3, in the same way that the argument that "disloyalty" justifies discharge would.[6]
 
 
 31
 For these reasons we remand this case for further findings (and for evidentiary proceedings if necessary), rather than attempting to decide it on the record before us, because the district court's comments do not make clear exactly what reason the court thought defendant had proven, nor do they provide an adequate basis for us to decide whether the analysis of Crown Zellerbach applies.
 
 
 32
 It is entirely possible that under all the circumstances Procunier showed a "legitimate" reason for the discharge. But, because a sense of "disloyalty" is inherent in almost any assertion of Title VII rights, we think it essential to determine whether the alleged disloyalty here constituted a legitimate business reason under the Crown Zellerbach test or was of a sort that is not cognizable as a defense to a retaliatory discharge claim.
 
 
 33
 For the reasons stated above, we affirm the district court's judgment on the section 2000e-2(a)(1) claim and remand the retaliatory discharge claim to the district court for further proceedings consistent with this opinion.
 
 
 34
 COFFEY, Circuit Judge, concurring and dissenting.
 
 
 35
 I join the majority opinion to the extent that it holds that the plaintiff failed to establish a Title VII sec. 2000e-2(a)(1) violation based on the defendants' overtime wage policy. I agree with the majority's conclusion that there is adequate evidence in the record to support the district court's finding that the defendants offered overtime hours to custodians based on considerations other than sex. However, I cannot join that part of the majority's opinion which asserts that the district court "may have used the wrong standard to determine whether the defendant had carried its burden under part two of the Burdine test," nor can I agree with the majority's unwarranted usurpation of the district court's responsibility for assessing the credibility of testimony elicited in its presence. Accordingly, I dissent from that portion of the majority's opinion directing a remand of this case for clarification of the district court's allocation of burden of proof and production on the retaliatory discharge claim, and for further inquiry into the reasons proffered by the defendants for their discharge of the plaintiff.
 
 
 36
 The record in this case clearly demonstrates that the district court understood and applied the proper standard of review when determining whether the defendants had met their burden of production under the Burdine test. The majority in a futile attempt to support its fallacious reasoning excises small sections of the record which, if read separately and apart from the overall discussion by the district court of the defendants' burden of production, could suggest that the trial court misconstrued the defendants' responsibility under part two of the Burdine test. However, a careful reading of the entire record relating to the allocation of burdens of production and persuasion under Burdine clearly establishes that the district court understood and properly applied the Burdine test to the facts of this case.[1]
 
 
 37
 It is the majority that apparently misunderstands and misconstrues part two of the Burdine test. Contrary to the ruling case law, the majority's position would require the defendant to establish something more than that it discharged the plaintiff for non-discriminatory reasons. Not only does this misinterpret the Burdine test, but, in effect, effectively shifts the burden of persuasion to the defendants which, as we pointed out in Klein v. Trustees of Indiana University, 766 F.2d 275 (7th Cir.1985), clearly is not the function of part two of the Burdine test: "(t)he defendant's burden in presenting a legitimate, non-discriminatory reason for its actions is only a burden of production; the burden of persuasion rests at all times on the plaintiff." Klein, 766 F.2d at 280 (citation omitted). As the Supreme Court noted in Burdine, the purpose of shifting the burden of production in these cases is to "bring the litigants and the court expeditiously and fairly" to the ultimate issue of whether the defendant's discharge of plaintiff was retaliatory. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093.
 
 
 38
 Since the burden of production does not shift to the defendants until the plaintiff has made out a prima facie case establishing a discriminatory motive, it only stands to reason that the defendant meets its burden of production by introducing evidence that controverts the plaintiff's prima facie case of discriminatory motive. In other words, the defendants effectively rebut the presumption of discriminatory motive and force the plaintiff to her ultimate burden of establishing that the defendants' explanation for her discharge is merely a pretext, see Burdine, 450 U.S. at 254, 11 S.Ct. at 1094, simply by proffering an explanation that is non-discriminatory. A non-discriminatory reason is a legitimate reason sufficient to meet the defendants' burden of production under part two of Burdine. In this case, the record is clear that the district court understood and applied this standard to the facts of this case. Therefore, I cannot agree with the majority's decision which desperately grasps at empty space for some reason to remand this case to the district court.
 
 
 39
 I also disagree with the majority's reasoning in second-guessing the district court's determination that the breakdown in the relationship between Procunier[2] and the plaintiff was the primary motive behind Procunier's decision to discharge the plaintiff. The majority's suggestion that disloyalty[3] is at best a dubious explanation for an employee's discharge where prior to the discharge the employee had expressed opposition to an employment practice puts this court in the position of second-guessing a credibility determination made by the district court--a court that was in a far better position to evaluate the credibility of the witnesses and to weigh the conflicting testimony.[4] Such second-guessing seems particularly unjustified where the record below is replete with facts that substantiate the defendants' explanation for plaintiff's discharge. Both the plaintiff and Procunier testified that communication between them broke down after the plaintiff had submitted the wage study to the school board without his knowledge or approval. Plaintiff testified that she and Procunier no longer worked together on projects they had performed jointly before their problems began. Procunier testified that he felt he could no longer trust the plaintiff with important confidential matters, and thus refused to give the plaintiff assignments which involved problems of this nature.
 
 
 40
 Despite significant factual distinctions between this case and Crown Zellerbach, the majority asserts that Crown Zellerbach should control our disposition of the case before us. In Crown Zellerbach, the court noted that "it has never been disputed that the sole reason for the discharge was the letter" expressing opposition to the defendants' employment practices. Crown Zellerbach, 720 F.2d at 1011. In our case, the defendants contend that it was not the plaintiff's opposition to their employment policies that motivated the decision to discharge the plaintiff, and unlike Crown Zellerbach, the circumstances surrounding the plaintiff's discharge lend credibility to the defendants' explanation for their decision and thus support the district court's determination that the defendants had a legitimate reason for terminating the plaintiff.
 
 
 41
 In Crown Zellerbach, all of the employees who expressed opposition by signing the letter were discharged by the defendants. Moreover, Crown Zellerbach had a history of discrimination problems: the EEOC had, prior to the events which gave rise to the suit itself, determined that Crown Zellerbach's practices were "discriminatory in certain respects." 720 F.2d at 1010. In the case before us, the plaintiff was the only member of the "opposition group" who was discharged after the study prepared by the group was presented to the school board, even though in the past she had voiced objections without any repercussions. Moreover, the record makes clear that Procunier supported the opposition group: he encouraged the group to hold meetings and even attended one of the meetings; he testified that he supported the group's position with respect to overtime pay and that he was not opposed to an employee going directly to the school board with grievances.
 
 
 42
 Finally, and perhaps most importantly, the plaintiff Jennings in this case, unlike the warehouse employees discharged in Crown Zellerbach, occupied a position of significant responsibility and trust as well as confidence.[5] A warehouse employee's (laborer's) responsibilities and duties do not require a close and confidential relationship with an employer. In contrast, as executive secretary, the plaintiff had access to the most highly confidential information in the organization as well as personal information of the employer. The ability of the employer to trust and to work closely with his executive secretary is paramount and essential to the orderly and efficient operation of any office. When the trust and confidence upon which the relationship between an executive secretary and the employer breaks down to the point where communication between the two is disrupted and thereby interferes with the operation of the office, the relationship, for all practical purposes, has come to an end; discharge merely formalizes that which both persons already knew was bound to come.
 
 
 43
 Beyond doubt the confidentiality and trust that must exist between an executive secretary and the employer are bona fide occupational requirements of the position of executive secretary and thus the plaintiff's employment is clearly distinguishable from that of the warehouse employees (laborers) in Crown Zellerbach. The majority's comparison between the plaintiff's position as an executive secretary and the warehouse employees in Crown Zellerbach is ridiculous and almost not worthy of comment. Therefore I cannot agree with the majority's decision to remand this case to the district court for further inquiry into the legitimacy of the defendants' explanation for the plaintiff's discharge in light of the overwhelming evidence supporting the district court's conclusion that the plaintiff was not terminated because of her opposition to the defendants' employment policies. Since the record contains sufficient evidence to support the district court's conclusion that the plaintiff failed to establish her claim of retaliatory discharge, and further, because the court found the defendant's testimony credible, a finding clearly not erroneous, the majority, in remanding this case to the trial court, has invented a new standard of review not supported in case law, I must dissent.
 
 
 
 *
 Honorable Terence T. Evans, District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 A noncertified employee does not hold an Illinois certificate for school administration, teaching or a specialized job such as school psychologist
 
 
 [2]
 Defendant argues that plaintiffs did not establish a prima facie case because there were other salaried employees for whom plaintiffs did not present evidence of discrimination. "Class II" and "Class III" employees, who include nurses and teacher aides, are also salaried employees. They are not included in "Class I" because they do not work fifty-two weeks a year. Arguendo, we shall assume that to establish a prima facie case plaintiffs need only show a difference in treatment between two major groups of employees of different sex even though the two groups do not exhaust the relevant employee pool (as was apparently the case in Boyd ). It may well be that the plaintiffs do not need to exhaust the relevant employee pool to establish a prima facie case, but that the defendants may introduce evidence of how other employee groups are treated to defeat the prima facie case
 
 
 [3]
 The district court stated that the reason she was discharged "was that she went over his head ... and thereby lost his trust and confidence." Tr. at 368. Yet at another point the court stated that "he was not opposed to an employee going directly to the Board...." Tr. at 456. At still another point the court refers to a "personality conflict that developed rather quickly, triggered, perhaps, by the fact that he felt that she was not being fair with him and taking this matter directly to the Board without discussing it with him or asking him to submit it to the Board." Tr. at 457
 
 
 [4]
 The district court stated:
 Whether the reason was good or bad, as I said yesterday, and I think the parties realize, is not the issue. An employer can make bad mistakes--and we see them in these cases rather frequently--and they are offensive to the employee who files the lawsuit. But as long as the bad mistake is not one based on a violation of Title VII, in this case retaliation because of advocacy of some kind of policy that the plaintiff believed was to correct an enequity [sic] under Title VII, as long as that is not the reason, it doesn't make any difference what the reason is.... If you don't prove the motivation that is required by the statute or don't prove that the given motivation is a pretext so that the motivation required by the statute is present, then the plaintiff can not recover.
 Tr. at 459 (emphasis added); see also Tr. at 452 ("Whether the reason was justified or good business judgment is not the issue. It is whether or not it existed.").
 
 
 [5]
 In a different case we might be willing to assume that the district court had found the proffered reason to be legitimate. In this case, however, the judge was apparently not entirely familiar with the law of retaliatory discharge. For example, he initially thought that the retaliation claim could only succeed if plaintiff won on her substantive Title VII claim. See Tr. at 371. Further, the district court judge made some of his factual findings on the retaliation claim while under this misimpression. See Tr. at 368
 
 
 [6]
 The dissent's approach would in effect deprive employees whose jobs require the trust and confidence of their employers the protection of section 2000e-3. Such an employer could, under the dissent's approach, avoid a claim of retaliatory discharge by unilaterally bringing about a change in the working relationship with the employee and then claiming that a "loss of trust" has caused a "disruption" in the workplace
 
 
 [1]
 The following statements by the district court make this clear:
 "I realize that the state of the law puts a very heavy burden on the plaintiff once the defendant articulates a business or non-discriminatory reason for the discharge." Tr. at 455 (emphasis added).
 * * *
 "Now, that is a matter that you may say is not a good reason for a discharge, and the answer is that it doesn't make any difference whether it is a good reason as long as that was the reason and the reason was not because of a protest of the unfair or illegal employment practice." Tr. at 368.
 * * *
 "But I think that we have to remember that there is a second point and that is that the cases defeat that claim if the employer can show a bona fide business reason for the discharge. That is where I think the plaintiff's case at this point is fatally defective." Tr. at 373.
 * * *
 "Now, beyond that, though, if the employer articulates and shows by competent testimony that the reason for the discharge was not because of some employment practice she was protesting--whether it was an unlawful employment practice or not really doesn't enter into that--but shows that he had a business reason for the discharge not related to the employment practice, then the burden shifts back to the plaintiff to show that that was a pretext." Tr. at 368.
 Even plaintiff's counsel characterized the burden in this manner:
 "We would submit, your Honor, that once the business reason is established, I don't think that we have to prove that it was, again, because of intentional discrimination against women, you know, down-trodding and all that." Tr. at 369.
 
 
 [2]
 Procunier was superintendent of the defendant school district and plaintiff's immediate supervisor
 
 
 [3]
 The majority incorrectly characterizes the defendants' explanation for plaintiff's discharge as based only on disloyalty. The record is clear that loyalty was only one of the factors considered by Procunier in his decision to discharge the plaintiff. He considered her to be untrustworthy and thus had a lack of confidence in her ability to perform in the executive position she held
 
 
 [4]
 Rule 52(a) of the Federal Rules of Civil Procedure provides in part that:
 "(F)indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses."
 Moreover, the advisory committee notes to Rule 52(a) explain that:
 "(t)o permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.
 Furthermore, this court has repeatedly stated that credibility determinations are not appropriate for appellate review absent extraordinary circumstances:
 "We defer to the trial court on issues of credibility absent clear error." Walsh v. Brewer, 733 F.2d 473, 477 (7th Cir.1984) (citation omitted).
 "We are not inclined to make a fresh appraisal of the credibility of witnesses whom the trial judge saw and heard." Denison Mines, Ltd. v. Michigan Chemical Corp., 469 F.2d 1301, 1310 (7th Cir.1972) (Stevens, circuit judge).
 "Questions of credibility were properly resolved by the trial court and are not to be considered on appeal." Matthews v. James Talcott, Inc., 345 F.2d 374, 381-82 (7th Cir.1965).
 
 
 [5]
 My position does not, as the majority asserts, allow employers to "avoid a claim of retaliatory discharge by unilaterally bringing about a change in relationship with the employee and then claiming that a 'loss of trust' has caused a 'disruption' in the workplace." I make it eminently clear in my dissent that "trust" and "confidence" are very legitimate considerations in the determination of whether or not to discharge an "executive secretary." This record is most clear that the termination of the plaintiff was not retaliatory but was required if the executive office was to continue to operate in a proper business-like environment, and strange as it may seem it is not the function of this court to second-guess the trial court's decision that the defendants had presented sufficient credible evidence to establish that the discharge of the plaintiff was motivated by legitimate considerations of "trust" and "confidence."