Kathryn M. JENNINGS,
Plaintiff–Appellant,

v.

TINLEY PARK COMMUNITY CONSOL-
IDATED SCHOOL DISTRICT NO.
146, Defendant–Appellee.

No. 88–1445.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1988.

Decided Dec. 30, 1988.

Diane I. Jennings, Lord Bissell & Brook, Chicago, Ill., for plaintiff-appellant.

David Kula, Scariano Kula Ellch & Himes, Chtd., Chicago Heights, Ill., for defendant-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and PELL, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Plaintiff Kathryn Jennings appeals the district court's denial of her claim of retaliatory discharge as proscribed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Jennings originally brought suit alleging unlawful employment discrimination based upon sex as well as unlawful retaliatory discharge. The district court, Judge McMillen, held for the defendants on both counts. This Court affirmed the lower court with respect to the employment discrimination claim, but vacated judgment on the retaliatory discharge claim and remanded the case to the district court. *Jennings v. Tinley Park Community Consolidated School District No. 146,* 796 F.2d 962 (7th Cir.1986), certiorari denied 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (*"Jennings I"*). On remand the district court, Judge Norgle, ruled in favor of the defendants on the retaliatory discharge claim. Jennings now appeals this ruling.

## I. FACTS AND PROCEEDINGS BELOW

Jennings was employed by the Tinley Park (Illinois) Community Consolidated School District No. 146 from November 1973 until June 1979, serving as secretary to the Superintendent of the School District, Robert Procunier. Jennings' employment ended on June 15, 1979, when she was discharged by Procunier due to events and conduct surrounding a protest of alleged unlawful discrimination based upon sex.

The alleged sex discrimination concerned a disparity in pay between the School District's secretaries and custodians. During this period in issue, the School District designated the two groups of employees, secretaries and custodians, as "Class I" employees. Class I employees were full-time, salaried, non-certified employees.[1] All secretaries were female; all custodians were male. Custodians were paid one and one-half times their hourly rate for overtime work as approved by a supervisor. Secretaries were not paid for overtime work. Defendants argued that secretaries were not required to work overtime.

Beginning in February 1979, the secretaries as a group first voiced concern over the perceived disparity in compensation between themselves and the custodians. At this time the School Board rejected a proposal by Procunier which would have vested in him the discretion to determine which district employees would be required to work on days that the schools would not open due to inclement weather. The School Board instead adopted a policy whereby every employee was expected to report to work on such days, and those that failed to report would be docked a day's pay. At Procunier's direction Jennings convened a meeting of the secretaries to elicit their reaction to the School Board's new policy. The secretaries objected to the new policy and were particularly disturbed that while they could be docked a day's pay due to inclement weather, they were ineligible for overtime pay. The secretaries embodied their views in a letter to the School Board, which was given to Procunier to present.

The secretaries remained disillusioned with the compensation policies of the School District and requested permission from Procunier to meet on a bimonthly basis, beginning in March 1979. Procunier granted the secretaries' request but declined their invitation to attend, sending in his stead Noel Swinford, the Assistant Superintendent. The secretaries held the March meeting as scheduled and provided Procunier with the minutes of the meeting.

1. A non-certified employee does not hold an Illinois certificate for school administration, teaching or a specialized position, such as school psychologist.

Jennings also spoke to Procunier about the secretaries' concerns.

At the secretaries' next regularly scheduled meeting, on May 23, 1979, Swinford presented a salary schedule proposed by Procunier and to be presented to the School Board at its next meeting, which was on the following day. The secretaries had never before been presented with a salary schedule in advance. The proposed salary schedule was opposed by the secretaries, primarily because of the perceived continuation of pay disparities between them and the custodians. Consequently, the secretaries decided to form an ad hoc committee to attend the School Board meeting on the following day, May 24. Again, minutes of the secretaries' meeting were delivered to Procunier, and Jennings and he discussed the secretaries' concerns.

The following day during the School Board meeting Procunier proposed his salary schedule as planned. The secretaries' ad hoc committee was in attendance and, after Procunier presented his salary schedule, explained the secretaries' opposition thereto. The School Board passed the salary schedule despite the secretaries' opposition.

In response to the School Board action on the salary schedule proposed by Procunier, the secretaries decided to prepare their own salary schedule, one that would contradict Procunier's. Jennings was the principal draftsman. The final draft, entitled "P.S. Salary Study" and consisting of the secretaries' proposed salary schedule and the minutes of their March and May meetings, was set for distribution on June 1, 1979. The P.S. Salary Study was signed collectively by the Committee of Concerned Secretaries, and individually by, among others, Jennings. This action, in contrast to the other meetings and activities, was done without Procunier's knowledge.

Rather than deliver the P.S. Salary Study to Procunier and instruct him to present it to the School Board at the next meeting (apparently scheduled for June 19th), as they had done previously, the secretaries decided to deliver individually the P.S. Salary Study to each Board member on June 1.

Jennings was responsible for delivering a copy to Procunier, who heretofore was unaware of the P.S. Salary Study. Although delivery of the P.S. Salary Study to School Board members began at 2:00 P.M., and despite seeing and speaking to Procunier throughout the day—in fact Procunier asked Jennings to arrange a meeting with the secretaries so that Procunier could address their concerns—she did not deliver a copy to Procunier, nor inform him of its existence, until 3:50 P.M. that same day. Because of the timing of the delivery, Procunier was unable to respond to individual School Board members' inquiries which began that same day.

Following receipt of the P.S. Salary Study, the working relationship between Procunier and Jennings deteriorated. Procunier distanced himself from Jennings. Whereas prior to June 1, the delivery date of the P.S. Salary Study, Procunier had Jennings open the mail and the two would then review it together, after June 1 Procunier instructed her to leave the unopened mail in his office. He also instructed her not to answer phone calls on his personal line, as she had done in the past. A chair was removed from Procunier's office, apparently so that Jennings would have no place to sit.

On June 13, Procunier met with Jennings to discuss the timing and direct delivery of the P.S. Salary Study to Board members. Procunier expressed his displeasure at not being informed of its preparation and especially at not receiving a copy sooner. Jennings responded that some of the secretaries did not trust Procunier to present the P.S. Salary Study to the School Board, and thus the reason for the extraordinary delivery to Board members. Procunier replied that if such was the case, he expected Jennings to stand up and vouch for his trustworthiness, and if Jennings was unable to do this, then he could not in turn trust her.

On June 15, Procunier again met with Jennings and informed her that because she had not been loyal and supportive, he would recommend to the School Board that she be terminated. The reasons for her

discharge were set forth in a letter of that same day, reciting in pertinent part:

It is with considerable reluctance that I terminate your employment as my secretary. Although your technical and professional competence have been outstanding throughout the period of your employment, events of the past 2–3 weeks have generated serious questions relative to your ability to serve me or the Board of Education in an effective manner as required.

The very important element of mutual trust and support which is so essential in the relationship of a personal secretary to the administrator responsible for an operation similar to this school district, has been seriously undermined. As a result of your reluctance to inform me [in advance] of actions which you and other secretaries took relative to communication with the Board of Education, you have created a situation which is antagonistic to the close, confidential working relationship which is necessary in this office. The deterioration of the level of trust and support leaves no alternative open to me.

(Jennings Br. 18).

The sole rationale for Jennings' termination was her conduct arising out of the preparation and delivery of the P.S. Salary Study as it related to Procunier, her supervisor. No other secretary was terminated or disciplined for participating in the P.S. Salary Study or for delivering it directly to Board members.

Jennings brought suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging employment discrimination based upon sex and unlawful retaliatory discharge in response to protected opposition thereto. Judge McMillen of the Northern District of Illinois entered judgment, without extensive factual findings, in favor of the defendants on both counts. Jennings appealed.

In *Jennings I*, this Court affirmed the lower court's holding that any disparate treatment accorded to the secretaries and custodians was based upon reasons other than sex. However, this Court vacated Judge McMillen's holding on the retaliatory discharge claim and remanded that issue for factual findings. On remand the case was assigned to Judge Norgle. By agreement of both parties, the case was submitted to him on the transcript of the previous trial; no further evidence was considered. Judge Norgle also held in favor of the defendants, determining that Procunier's reaction to Jennings' conduct was reasonable and as such constituted a legitimate basis for discharge and therefore was not retaliatory in contravention of Title VII.

## II. DISCUSSION

As noted in *Jennings I*, this Court remanded to the district court the issue of whether the termination of Jennings was unlawful pursuant to Title VII, which proscribes "discrimination against any ... employees ... [who] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A claim of retaliatory discharge in contravention of Title VII prompts a three-step analysis as set forth by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981); and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed. 2d 668 (1973).

■ First, the plaintiff has the burden of proving a prima facie case of discrimination based upon opposition to an unlawful employment practice. See *Burdine*, 450 U.S. at 252–253, 101 S.Ct. at 1093–1094. The plaintiff meets this burden by establishing that: (1) she was engaged in statutorily protected expression, *viz.*, opposition to a seemingly unlawful employment practice; (2) she suffered an adverse employment action; and, (3) there was a causal connection between the statutorily protected expression and the adverse employment action. See *Equal Employment Opportunity Comm'n v. Crown Zellerbach Corp.*,

720 F.2d 1008, 1012 (9th Cir.1983); *Payne v. McLemore's Wholesale and Retail Stores,* 654 F.2d 1130, 1136 (5th Cir.1981), certiorari denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866. The plaintiff need not establish that the action she was protesting was actually an unlawful employment practice; but rather only that she had a reasonable belief that the action was unlawful. *Berg v. La Crosse Cooler Co.,* 612 F.2d 1041 1045–1046 (7th Cir.1980).

Second, assuming the plaintiff is able to establish a prima facie case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the adverse employment action. See *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Crown Zellerbach,* 720 F.2d at 1012. Disciplining an employee for protesting apparently unlawful employment discrimination is, of course, not a legitimate, nondiscriminatory reason. However, courts have held that a decision to discipline an employee whose conduct is unreasonable, even though borne out of legitimate protest, does not violate Title VII. *McDonnell Douglas,* 411 U.S. at 802–806, 93 S.Ct. at 1824–1826 (illegal acts held unreasonable form of protest); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 229–234 (1st Cir.1976) (hostile, disruptive conduct held unreasonable form of protest); see also *Payne v. McLemore's Wholesale and Retail Stores,* 654 F.2d 1130, 1142 (5th Cir. 1981); *Jennings I,* 796 F.2d at 967–968.

Finally, if the defendant is able to carry its burden of articulating some legitimate, nondiscriminatory reason for the adverse action, the burden then shifts to the plaintiff to show that the defendant's articulated reason was truly pretextual for the defendant's actual discriminatory motive. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

### 1. The District Court's Decision

On remand the district court was to resolve the issue of whether the defendants had articulated a legitimate reason for the discharge.[2] The original district judge did "not make clear exactly what reason the court thought defendant had proven." *Jennings I,* 796 F.2d at 968. Therefore the second district judge was to determine factually whether the reason for Jennings' discharge was a legitimate business reason.

On remand Judge Norgle, by agreement of both parties, did not hold evidentiary proceedings; rather he decided the case based upon the trial record developed previously. In his written order, Judge Norgle lists as findings of fact several significant items. The essential ones are: mutual trust and confidence between Procunier and Jennings were essential to the proper functioning of the workplace; Jennings told Procunier she did not trust him to deliver the salary study to the School Board; Jennings' belief that Procunier would not deliver the salary study to the School Board was unreasonable; the salary study was not presented to Procunier prior to being delivered to members of the School Board in order to enhance its effectiveness; Procunier discharged Jennings because of the form of her protest, *i.e.,* not informing Procunier of the salary study or giving him a copy before it was delivered to the School Board; Jennings' discharge was based upon a loss of trust and confidence by Procunier, which was reasonable under the circumstances. See list of district court's findings appended to this opinion.

### 2. Analysis on Appeal

Jennings appeals the district court's findings, essentially challenging its factual determinations. Federal Rule of Civil Procedure 52(a) provides that "[f]indings of fact ... shall not be set aside unless clearly erroneous." A finding is clearly erroneous when "the reviewing court is left with the

---

**2.** In *Jennings I,* this Court finally determined all other issues. Jennings had a reasonable belief that she was victim of unlawful sex discrimination, engaged in protest against the perceived discriminatory treatment, and was discharged.

The only remaining question left for redetermination was whether her discharge was the result of the statutorily protected expression or a legitimate, nondiscriminatory reason. See *Jennings I,* 796 F.2d at 968–969.

definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Even though the district court's findings were not based upon evidence directly heard, but rather on a previously heard trial record, a reviewing court must keep in mind that:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.... This is so even when the district court's findings do not rest on credibility determinations, but are based on physical or documentary evidence or inferences from other facts.

*Anderson v. City of Bessemer*, 470 U.S. 564, 573–574, 105 S.Ct. 1504, 1511–1512, 84 L.Ed.2d 518 (1985). Although the issues were resolved below only by reference to a past trial record, we are still constrained from setting aside any of the factual findings. Our restriction against setting aside factual determinations is not eased when the trial court has decided the case without the benefit of observing trial witnesses testify. We still may not freely substitute our own beliefs as to the facts absent a clearly erroneous decision below.

Although unable freely to set aside factual determinations of the district court, we are not precluded from reviewing errors of law that are based upon factual findings. Rule 52(a) does not prevent a reviewing court from correcting "errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a rule of law." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984) (citation omitted); see also *Hope, Inc., v. County of DuPage*, 738 F.2d 797 (7th Cir.1984) (ultimate finding of fact is clearly erroneous where the subsidiary facts upon which it is based are clearly insufficient to meet the established legal standard). Accordingly, respect and deference are owed to the district court's purely factual determinations, but less so to those determinations that depend upon or incorporate a rule of law. This distinction is especially crucial in this case where the legal conclusions rest so heavily on the particular factual findings.

In *Jennings I*, this Court expressed some doubt as to whether mere "disloyalty" can ever be the sole legitimate nondiscriminatory reason for discharging an employee protesting unlawful employment practices. Noting the Ninth Circuit's opinion in *Crown Zellerbach*, the panel majority observed that almost every form of opposition to an employment practice is in some sense disloyal. See *Jennings I*, 796 F.2d at 968, citing *Crown Zellerbach*, 720 F.2d at 1014.

In *Crown Zellerbach*, a group of minority employees, seeking to remedy what they perceived to be unlawful employment discrimination, filed complaints with the Equal Employment Opportunity Commission and engaged in other forms of protest activity. In particular, the group wrote letters not only to the employer's corporate parent requesting an open meeting to discuss the situation, but also to local officials, protesting the failure of public officials to investigate. The group picketed the office of the Mayor of Los Angeles. The group also lodged an administrative complaint with the Office of Federal Contract Compliance, charging that the employer's practices did not conform to Executive Order 11246, and this was later borne out by a General Services Administration investigation. All of this activity apparently was readily known by the employer. Finally, the group discovered through the company newspaper that the employer was to receive an award from the Los Angeles School District, a significant customer, for sponsorship of a program designed to provide career guidance to students at a predominantly Hispanic school. The group, believing that the employer did not merit an award for undertaking affirmative action, then wrote a letter to the School Board, composed of elected officials, to inform it of the "bigoted position of racism" and of various discrimination charges that had been filed against the company. As a consequence, the em-

ployer fired the group of employees for "disloyalty."

The Ninth Circuit applied a reasonableness test to determine whether the conduct could provide a legitimate nondiscriminatory basis for the discharge. Holding for the employees, the court determined that disloyalty alone would not suffice as reason for discharge, remarking that otherwise virtually any opposition, no matter how reasonable, could be chilled in that opposition by definition connotes overtures of disloyalty. Rather, the court determined that the letter to the School Board was an appropriate response to a decision by a body of elected officials to bestow an affirmative action award upon the employer.

The Ninth Circuit carefully distinguished cases in which an employee's opposition to perceived unlawful employment practices was determined to be unreasonable. In particular, the court distinguished *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976), where the manner of opposition by an employee was held unreasonable. Although the First Circuit in *Hochstadt* expressly determined that the employee's conduct was "disloyal," it was also clear that the employee's conduct resulted in her poor work performance and also in fellow employees' diminished performance and reduced morale. The employee in *Hochstadt* would have been fired based on her employment performance alone without reference to the crux of her opposition.[3] *Hochstadt*, 545 F.2d at 230–234.

The standard adopted in *Crown Zellerbach* remains applicable in this case. The issue before us is whether Jennings' conduct gave rise to a legitimate nondiscriminatory reason for her discharge, despite the fact that the substance of her protest was protected. Although the district court held that "objection to the form of the protest cannot be easily divorced from an objection to the protest itself,"[4] that is exactly the result compelled by *Crown Zellerbach*. The substance of the secretaries' protest, unlawful sex discrimination, is of course protected. But the outcome here depends on whether in pursuing her protest, Jennings exceeded the cloak of statutory protection by engaging in unreasonable conduct.

The district court found, and we do not question, that in order to enhance its effectiveness Procunier was not informed of the P.S. Salary Study, nor given an advance copy. Despite seeing and speaking to Procunier throughout the day, Jennings deliberately chose to keep him in the dark instead of following past practice of letting him present such a study to the Board. Accordingly Procunier, the proponent of the competing salary schedule, was not given an opportunity to respond promptly to the School Board members' inquiries. Judge Norgle determined that the decision to withhold notice from Procunier and then surprise him with the P.S. Salary Study after the School Board members had been receiving their own copies, was unreasonable. Judge Norgle's findings compel the conclusion that Jennings' decision was a conscious effort to hamper a supervisor's ability to respond to his superiors for the purpose of accomplishing her own ends.

With Federal Rule of Civil Procedure 52(a) in mind, it would be improper to conclude that Judge Norgle's determinations are clearly erroneous. Moreover, despite Jennings' contentions, his determinations were purely factual. Jennings' moti-

---

**3.** The plaintiff in *Hochstadt* was a doctor employed by a biomedical research institute. The court in *Crown Zellerbach* summarized her disruptive and unreasonable behavior:
> She circulated rumors that the institute was about to lose its federal funding, which required the institute on three occasions to invite HEW officials to reassure institute scientists that their funding was not endangered. [545 F.2d] at 227. She allowed a local reporter to examine files containing confidential salary information. *Id.* She incurred $950 in charges on the institute's telephones for personal calls to her lawyers and others. *Id.* She continually quarreled with her subordinates, colleagues and superiors at the institute. *Id.*

*Crown Zellerbach*, 720 F.2d at 1015, discussing *Hochstadt*, 545 F.2d at 227.

**4.** See unpublished order, No. 80 C 2231 (N.D.Ill. Feb. 8, 1988) (Finding of Facts and Conclusions of Law, No. 10), appended to this opinion.

vations and the reasonableness of her actions do not by themselves invoke questions of law. As a consequence of the crucial findings below, it follows as a matter of law that the cloak of statutory protection does not extend to deliberate attempts to undermine a superior's ability to perform his job. As in *Hochstadt*, when an employee engaged in opposition to a perceived unlawful employment practice participates in conduct which does not further the protest, but rather merely hinders another person's ability to perform his job, that employee relinquishes statutory protection.

Here Jennings relinquished Title VII statutory protection. The substance of her protest was protected; she could not have been disciplined for her opposition to a reasonably perceived unlawful employment practice. Her decision to sandbag Procunier, however, was not entitled to protection. Perhaps if she had shown that Procunier was initially unresponsive, hostile or adversarial, such action might have been reasonable. But such was not the case. The facts indicate that Procunier was responsive, albeit his responses were not what the secretaries wanted to hear. The work environment was not disturbed because Procunier lessened Jennings' responsibilities; rather the environment was disturbed due to her decision to hinder her supervisor's ability to do his job. The record before Judge Norgle supports his conclusion that an adversarial relationship developed because of Jennings' unreasonable conduct.

An employee need not always inform a supervisor of her plans to, and substance of, protest. There are doubtless times where such a requirement would chill the rights of employees to engage in reasonable protest. Rather, we hold only that an employee may not use legitimate opposition to perceived unlawful employment discrimination as a gratuitous opportunity to embarrass a supervisor or thwart his ability to perform his job. Jennings' actions to hinder Procunier's ability to perform his job were purely gratuitous. If Procunier had been likely to disrupt or prevent legitimate opposition, contrary to what the district court found, the outcome of this litigation might be different.

Today's decision is not an affirmation of the "loyalty" defense that was questioned in *Jennings I*. It is doubtful whether loyalty alone can be a legitimate, nondiscriminatory reason for disciplining an employee engaged in opposition to an unlawful employment practice. The issue here is not simply loyalty; it is whether a supervisor can discipline an employee who deliberately interferes with the supervisor's efficacy in relationship to his superiors, particularly when the employee is in a position to repeat the interference. This decision recognizes that it is not unreasonable for a supervisor who has been thwarted once vis à vis his superiors to expect a repetition and to take action to avoid another attempt. An employer may in such circumstances discipline the employee, not because of her opposition, not because of a sense of disloyalty, but rather because of the employee's deliberate decision to disrupt the work environment, including her superior's standing with his own superiors.

The decision of the district court is affirmed.

### APPENDIX

District Judge Norgle's Findings of Fact and Conclusions of Law Contained in Unpublished Order, No. 80 C 2231 (N.D.Ill. Feb. 8, 1988), in *Jennings v. Tinley Park Community Consolidated School District No. 146*

1. Jennings was the only member of the group that prepared the salary study who was discharged.

2. Jennings had voiced objections in the past without suffering any adverse employment action.

3. Mutual trust and confidence between the superintendent and Jennings was essential to the proper functioning of the workplace.

4. Jennings herself told the superintendent *she did not trust him* to deliver the salary study to the board.

5. The salary study was delivered to the board without informing the superintendent.

6. Jennings' duties included answering the superintendent's personal telephone, opening his mail and going through it with him, and typing confidential documents and letters. Jennings also acted as the superintendent's eyes and ears when he was away, reporting, both in writing and orally, rule violations by other employees as well as other matters of administrative concern.

7. The salary study was not presented to the superintendent before its presentation to the board in order to enhance its effectiveness.

8. Jennings' belief that the superintendent would not deliver the salary study or voice the secretary's objections to the board, was unreasonable.

9. Procunier discharged Jennings because of the form of her protest, i.e., because she did not inform him of the salary study before distributing it to the board, not because of the content of the salary study or because she was protesting existing salary schedules.

10. The reasoning of the *Crown Zellerbach* case is applicable to the facts of this case because objection to the form of the protest cannot be easily divorced from an objection to the protest itself.

11. Jennings was discharged because she was the only secretary who stood in a confidential relationship with the superintendent, not because she was the instigator or prime motivator of the protest.

12. The proffered reason for Jennings' discharge was not unreasonable under the facts and circumstances of this case.

13. It was not unreasonable for the superintendent to expect his personal secretary to inform him of the salary study prior to its distribution to the board.

14. Procunier's disappointed expectations and Jennings lack of trust in him constituted a legitimate, non-discriminatory, business reason for her discharge under the facts and circumstances of this case.

15. Procunier's claim of lost trust and confidence does not undermine section 2000e–3 under the facts and circumstances of this case.

16. Although Jennings' job performance was not affected, the form of her protest caused a breakdown in the working relationship and that breakdown cannot be attributed to Procunier's reaction to Jennings' conduct. Rather, the breakdown is attributable to Jennings' conduct.

17. The reason given for Jenning's discharge was the reason actually relied upon, it was not pretextual.

Because defendant has provided a legitimate, non-discriminatory reason for plaintiff's discharge and plaintiff has failed to prove that reason is merely a pretext, defendants are entitled to judgment in their favor. Judgment for defendant.